UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------X

UNITED STATES OF AMERICA      :
      :
    -against-      :
      :      No. 23-cr-192 (NRM)
JASON ROBINSON,      :      **ORAL ARGUMENT**
      :      **REQUESTED**
      :
    Defendant.      :

--------------------------------------------------------X


# MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS


BENJAMIN YASTER
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
*Counsel for Jason Robinson*


CC:   BREON PEACE, United States Attorney
       Eastern District of New York
       271 Cadman Plaza East
       Brooklyn, NY 11201
       Attn: Gilbert Rein & Sean Fern, Assistant United States Attorneys

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................... i

INTRODUCTION ............................................................................................1

    I.   The border search of Mr. Robinson and his electronic devices. ......................1

    II.  Argument. .................................................................................................4

        A.  CBP and HSI's search and seizure of the iPhone violated the Fourth
        Amendment.................................................................................................5

        B.  Mr. Robinson's statements to the HSI agent were obtained in violation of
        the Fifth Amendment. ...............................................................................13

        C.  The two-month delay in searching the laptop, SD card, and thumb drive
        was unreasonable. ......................................................................................18

CONCLUSION ..............................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Doe v. United States*,
    487 U.S. 201 (1988) ................................................................................. 16

*In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*,
    670 F.3d 1335 (11th Cir. 2012) ............................................................... 16

*Hiibel v. Sixth Judicial Dist. Ct. of Nevada, Humboldt Cnty.*,
    542 U.S. 177 (2004) ................................................................................. 16

*Katz v. United States*,
    389 U.S. 347 (1967) ................................................................................... 5

*Miranda v. Arizona*,
    384 U.S. 436 (1966) ................................................................................. 13

*Mincey v. Arizona*,
    437 U.S. 385–94 (1978) .............................................................................. 5

*Muniz v. Pennsylvania*,
    496 U.S. 582 (1990) ................................................................................. 16

*Navarette v. California*,
    572 U.S. 393 (2014) ................................................................................. 13

*Rhode Island v. Innis*,
    446 U.S. 291 (1980) ................................................................................. 14

*Riley v. California*,
    573 U.S. 373 (2014) ......................................................................... 6, 7, 8

*Schneckloth v. Bustamante*,
    412 U.S. 218 (1973) ................................................................................. 17

*United States v. Aigbekaen*,
    943 F.3d 713 (4th Cir. 2019) ................................................................. 13

*United States v. Anderson*,
    929 F.2d 96 (2d Cir. 1991) ..................................................................... 17

*United States v. Asbury*,
    586 F.2d 973 (2d Cir. 1978) ................................................................... 10

*United States v. Booker*,
    561 F. Supp. 3d 924 (S.D. Cal. 2021) ................................................... 16

*United States v. Camou*,
    773 F.3d 932 (9th Cir. 2014) ................................................................... 7

*United States v. Cano*,
    934 F.3d 1002 (9th Cir. 2019) ........................................................... 11, 13

i

*United States v. Carr*,
  63 F. Supp. 3d 226 (E.D.N.Y. 2014) ................................................................ 14
*United States v. Djibo*,
  151 F. Supp. 3d 297 (E.D.N.Y. 2015) .................................................. 14, 15, 16
*United States v. Flores-Montano*,
  541 U.S. 149 (2004) .......................................................................................... 6
*United States v. FNU LNU*,
  653 F.3d 144 (2d Cir. 2011) ....................................................................... 14, 15
*United States v. Gavino*,
  No. 22-cr-136 (RPK) 2024 WL 85072 (E.D.N.Y. Jan. 7, 2024) ................. 11, 12
*United States v. Haak*,
  884 F.3d 400 (2d Cir. 2018) ....................................................................... 16, 17
*United States v. Kirk Tang Yuk*,
  885 F.3d 57 & n.11 (2d Cir. 2018) .................................................................... 7
*United States v. Kirschner*,
  823 F. Supp. 2d 665 (E.D. Mich. 2010) ........................................................... 16
*United States v. Levy*,
  803 F.3d 120 (2d Cir. 2015) ............................................................. 4, 6, 10, 13
*United States v. Levy*,
  2013 WL 664712 (S.D.N.Y. 2013) ................................................................... 10
*United States v. Martin*,
  157 F.3d 46 (2d Cir. 1998) .............................................................................. 18
*United States v. Montoya de Hernandez*,
  473 U.S. 531 (1984) ..................................................................................... 6, 10
*United States v. Moody*,
  649 F.2d 124 (2d Cir. 1981) ............................................................................ 14
*United States v. Pinto-Thomaz*,
  352 F. Supp. 3d 287 (S.D.N.Y. 2018) .............................................................. 17
*United States v. Ramsey*,
  431 U.S. 606 (1977) .......................................................................................... 6
*United States v. Smith*,
  673 F. Supp. 3d 381 (S.D.N.Y. 2023) ....................................................... 8, 9, 10
*United States v. Smith*,
  967 F.3d 198 (2d Cir. 2020) ................................................................. 18, 19, 20

**Other**

U.S. Const. amend. IV ............................................................................................ 5

**INTRODUCTION**

Jason Robinson is charged with transporting and possessing child pornography on his iPhone on November 14, 2022, when he reentered the United States at JFK Airport following a vacation abroad with his husband. Those charges arise from a warrantless and suspicionless search and seizure that U.S. Customs and Border Protection ("CBP") and Homeland Security Investigations ("HSI") performed upon Mr. Robinson's iPhone in JFK's Customs area. Although the government is granted significant leeway to conduct searches and seizures at the border, this search of Mr. Robinson's phone, and the highly private and sensitive information contained within it, was unreasonable, in violation of the Fourth Amendment.

Further, after detaining Mr. Robinson for nearly three hours to conduct this search, an HSI agent interrogated him about his possession of the iPhone and the child pornography found on it. The agent never provided the required *Miranda* warning, however, in violation of the Fifth Amendment privilege against self-incrimination.

Finally, the government waited two months before obtaining a warrant to search the contents of Mr. Robinson's laptop, thumb drive, and SD card after seizing them as part of the border search. It waited despite knowing, since November 14, 2022, all of the facts establishing probable cause, including the existence of child pornography files on the Mr. Robinson's iPhone. That delay was unreasonable, in violation of the Fourth Amendment,

These violations, as set forth below, require a remedy. This is suppression of the evidence from Mr. Robinson's seized electronic devices and his statements while detained at JFK Airport.

**I.      The border search of Mr. Robinson and his electronic devices.**

At approximately 5 p.m. on November 14, 2022, Mr. Robinson landed at JFK Airport with his husband on a flight from London. They were returning to the United States after a

weeklong vacation in Egypt, and were scheduled on a connecting flight to Pittsburgh, where they live. Ex. A ¶ 1.

After exiting the plane, Mr. Robinson and his husband walked with their carryon luggage to Customs for screening. They arrived at Customs at approximately 5:20 p.m. *See* Ex. B at JR0002. There, the screening CBP officer selected Mr. Robinson for secondary inspection, directed him to leave his husband and collect his luggage, and led him to another room. It was a little before 5:30 p.m. when Mr. Robinson entered secondary inspection. Ex. A ¶¶ 2-3.

There, Mr. Robinson was led to a counter, where a different CBP officer instructed him to identify and produce the electronics devices he was carrying. Mr. Robinson took out his iPhone, Microsoft Surface Pro laptop, and Switch gaming console. *Id.* ¶¶ 4-5. The CBP officer said he could keep the Switch and directed him to turn on his laptop and open his iPhone to the "About Device" screen. Mr. Robinson did as the CBP officer instructed. *Id.* ¶¶ 5-6. The CBP officer then took the iPhone and began typing information into her computer. Another person joined her, plugged a device into the laptop, and told her to "start here." The CBP officer then told Mr. Robinson to sit and wait. *Id.* ¶ 7.

Mr. Robinson waited for nearly three hours, until HSI Special Agent Allen Anstee summoned him to an interview room. *Id.* ¶¶ 8, 10; Ex. B at JR0003. During those hours, CBP officers searched Mr. Robinson's person three times, including once in what appeared to be a holding cell next to the sitting area. They also searched his carry-on luggage and seized a thumb drive from his backpack and the SD card from his gaming console. Ex. A ¶ 8. At multiple points during this period, Mr. Robinson requested permission to leave to speak with his husband. Each time, Mr. Robinson was told he could not leave. *Id.* ¶ 9.

2

It was sometime around 8 p.m., following this prolonged detention and the multiple searches, that Agent Anstee interviewed Mr. Robinson. They met one-on-one in a closed room next to the sitting area, out of view of others. There, the agent showed Mr. Robinson the iPhone, laptop, SD card, and thumb drive. *Id.* ¶ 10. He told Mr. Robinson that he was seizing them based on suspicion that they contained child pornography and indicated that he had seen illegal images on the phone. He asked for the passcodes to the phone and laptop, which Mr. Robinson provided. He also asked Mr. Robinson questions about the phone's contents. *Id.* ¶ 11. According to Agent Anstee's summary, Mr. Robinson "indicated that he knew what was found on the devices." Ex. B at JR003. Further, the agent reported observing Mr. Robinson to be nervous, visibly shaking, and concerned about being arrested. *Id.*[1] At no point, however, did Agent Anstee (or anyone else) advise Mr. Robinson of his *Miranda* rights. Ex. A ¶ 12.

Following the interview, Agent Anstee returned Mr. Robinson to the waiting area, where he remained there for another 45 minutes or so. During that time he was told, again, that he could not leave to speak with his husband. After 9 p.m., nearly four hours after he first approached Customs, Mr. Robinson was released with receipts for the four seized devices. *Id.* ¶ 13.

On November 21, 2022, the government obtained a warrant to search the contents of Mr. Robinson's iPhone. In its application, sworn out by HSI Special Agent Richard Stepien, the government asserted that CBP and HSI's initial search of Mr. Robinson's phone at JFK airport revealed multiple videos and photographs depicting child pornography. Ex. C ¶¶ 7-8. Agent Stepien also noted, in a footnote, that the initial examination of Mr. Robinson's iPhone was a "'routine' search[] at the border" that could be conducted "without 'reasonable suspicion that the

---

[1] Mr. Robinson is not conceding that he made these statements or exhibited such a demeanor. These reflect the HSI agent's version of the interrogation, which we are not contesting for purposes of this motion. We are providing them to show the alleged testimonial statements that should be suppressed.

prospective entrant has committed a crime.'" *Id.* ¶ 7 n.1 (quoting *United States v. Levy*, 803 F.3d 120, 122 (2d Cir. 2015)).

Two months later, on January 17, 2023, the government obtained a warrant to search the seized laptop, SD card, and thumb drive. In applying for that warrant, Agent Stepien relied upon the same information as in the iPhone warrant application, while noting that the preliminary review of the laptop at JFK Airport yielded no child pornography. *See* Ex. D. ¶¶ 8-9. The agent also noted that, in executing the November 21 warrant, the government had identified hundreds of illegal files on the iPhone. *Id.* ¶ 11. But this additional fact confirmed what the government had known since Mr. Robinson was first stopped, two months before applying for this new warrant: his phone contained images and videos depicting child pornography. Agent Stepien asserted that, based on the "several images depicting child pornography" found on the iPhone and his training and experience, it was likely that Mr. Robinson "has a larger collection of such images stored elsewhere; therefore, there is probably [sic] cause to believe additional CSAM is stored on the Subject Devices." *Id.* ¶ 13.

## II.    Argument.

CBP and HSI conducted a warrantless search and seizure of Mr. Robinson's electronic devices. Furthermore, this search and seizure was not based on reasonable suspicion, much less probable cause. Although the government is afforded great latitude to conduct searches and seizures at the border, the intrusive nature of a cell phone search demands some articulable basis—probable cause or, at the very least, reasonable suspicion—to believe incriminating evidence will be discovered. The government lacked this when its agents opened and reviewed the contents of Mr. Robinson's phone. That was unreasonable, in violation of the Fourth Amendment, and merits suppression of the phone and its fruits.

So, too, were Mr. Robinson's statements to the HSI agent obtained unconstitutionally. By the time he was questioned by Agent Anstee, Mr. Robinson had been detained for nearly three hours and repeatedly told he was not free to leave. Further, during the investigation, the agent made clear that Mr. Robinson was being held for purposes of a criminal investigation and asked questions that were intended to obtain incriminating evidence. This elevated Mr. Robinson's seizure to the equivalent of a custodial arrest. For his statements to be admissible, *Miranda* warnings had to be given. They were not. Mr. Robinson's statements should be suppressed for the *Miranda* violation and because they were otherwise compelled.

Finally, the government's delay in obtaining a search warrant for Mr. Robinson's laptop, SD card, and thumb drive was unreasonably long, in violation of the Fourth Amendment. When it applied for the search warrant on January 17, 2023, the government had known for two months all of the facts supporting probable-cause—including, most importantly, the existence of child pornography on Mr. Robinson's iPhone. Its lack of diligence searching these electronic devices was unreasonable and merits suppression of the laptop, SD card, and thumb drive evidence.

A.    **CBP and HSI's search and seizure of the iPhone violated the Fourth Amendment.**

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. Before conducting a search, the government generally must obtain a warrant based "upon probable cause, supported by Oath or affirmation," *id.*, "unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978) (internal quotation marks omitted); *accord Katz v. United States*, 389 U.S. 347, 357 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few

5

specifically established and well-delineated exceptions." (footnote omitted)). Mr. Robinson's iPhone was searched without a warrant or probable cause. Whether that was reasonable depends upon the resolution of two strands of conflicting Fourth Amendment jurisprudence.

On the one hand, the Supreme Court has long recognized that searches at the border generally can be performed without a warrant or probable cause. *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1984). "The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country," and has a historical tradition dating "from before the adoption of the Fourth Amendment." *United States v. Ramsey*, 431 U.S. 606, 619-20 (1977). In relieving the government of the probable-cause and warrant burdens for border searches, the Court has observed that the government's interest in "preventing the entry of unwanted persons and effects is at its zenith at the international border," *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004), including at an airport's customs zone, *see Levy*, 803 F.3d T 122. And, conversely, an individual traveler has a diminished expectation of privacy when attempting to enter the United States, given the government's profound interest in preventing contraband from entering and the common experience of being stopped and questioned at the border. *See Flores-Montano*, 541 U.S. at 154 ("[W]e have noted that the expectation of privacy is less at the border than it is in the interior.").

But a competing, more recent line of cases acknowledges that searches of modern cell phones and similar electronic devices can only be performed with a warrant and probable cause, even if an exception to those requirements might otherwise apply. Thus, in *Riley v. California*, 573 U.S. 373 (2014), the Supreme Court held that the law enforcement must obtain a warrant based upon probable cause to search a cell phone seized incident to arrest, even though a search

6

in that circumstance typically would not be subject to those requirements. *Id.* at 382-85, 403. Since *Riley*, courts have that a warrant based upon probable cause is necessary to search a cell phone recovered in plain view during an otherwise lawful search, *e.g.*, *United States v. Kirk Tang Yuk*, 885 F.3d 57, 79 & n.11 (2d Cir. 2018), or in the course a lawful search of a car, *e.g.*, *United States v. Camou*, 773 F.3d 932, 943 (9th Cir. 2014)—circumstances where, typically, the Fourth Amendment demands less.

These cases have declined to except phone searches from the warrant and probable-cause requirements because of the immense privacy interests at stake in modern cell phones. "Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person," *Riley* observed. 573 U.S. at 393. "Their immense storage capacity" allows "[t]he sum or an individual's private life [to] be reconstructed through a thousand photographs labeled with dates, locations, and descriptions." *Id.* at 393-94. And a search of the device allows the government to access "in digital form many sensitive records previously found in the home," as well as "a broad array of private information never found in a home in any form—unless the phone is." *Id.* at 396-97.

The government's interests in conducting an immediate, warrantless search of a cell phone also tends to be limited. "Digital data stored on a cell phone cannot be used to as a weapon to harm an arresting officer," *id.* at 387, and what evidence it contains can typically be preserved through means short of an exigent search, such as by turning off the phone, removing its battery, or disconnecting it from the cellular network, *id.* at 390-91. Further, with the ubiquity of cloud computing, much of the evidence the government intends to search on a phone may not be on the phone itself but on a server that the phone accesses remotely. *Id.* at 397. The remote location of cell phone data both expands the scope of the government's search—it is not just the phone, but

7

also those parts of servers it accesses—and diminishes the need for an immediate search of the device before a warrant is obtained, since the data can be found elsewhere. *Id.*

Neither the Supreme Court nor the Second Circuit has addressed how these doctrines should be reconciled where the government seeks to search a cell phone at the border. But we submit that there are only two possible answers to resolving these Fourth Amendment doctrines, either of which entitles Mr. Robinson to relief.

1.      The Court should find that the border exception must yield where the item to be searched is, as here, an iPhone. In this respect, the border exception is no different than the search-incident-to-arrest, plain-view, and automobile exceptions to the Fourth Amendment, which do not apply to cell phone searches. This result follows from the uniquely great privacy interests inherent in a modern cell phone, which outweigh the comparatively lower government interests in immediately searching a phone, even at the border.

*United States v. Smith*, 673 F. Supp. 3d 381 (S.D.N.Y. 2023), shows why. *Smith* begins by acknowledging that the border and cell-phone search caselaw all employ the same interest-balancing analysis to determine a search's reasonableness, and that, per *Riley*, courts should "not automatically presume that a balance previously struck as to a certain kind of physical search automatically extends to a search of the data contained on a person's cell phone." *Id.* at 393-94. Accordingly, the fact that the Supreme Court previously authorized warrantless and suspicionless searches at the border does not imply that the same standard applies to an iPhone.

*Smith* then weighed the defendant's privacy interests in his phone against the government's sovereign interests in policing the border and concluded that the former outweighed the latter. It observed that even at the border, a person's privacy interests in his cell phone remains great. *Id.* at 395. Though the border is a context where expectations of privacy are

8

tempered, that "has always been understood with respect to the physical things a person carried with her—whether at the time of the arrest or, as here, at the time of a border crossing." *Id.*

> Technological and cultural changes now mean that nearly all travelers carry with them, in additional to any physical items, a digital record of more information than could likely be found through a thorough search of that person's home, car, office, mail, and phone, financial and medical records, and more besides. No traveler would reasonably expect to forfeit privacy interests in all this simply by carrying a cell phone when returning home from an international trip.

*Id.* Defendants thus maintain strong privacy interests in their cell phones even if they are encountered at border—just as *Riley* recognized they do when they suffer the greater loss of privacy incumbent in a lawful arrest. *Id.*

By contrast, the government's competing interests in securing the border diminishes when the item to be inspected and block from entry is a cell phone. The governmental interests justifying the border-search exception to the warrant requirement include "preventing the introduction . . . of illicit substances of contraband," "apprehending persons who may pose a threat or lack authorization to be present in this country," "inspecting goods to ensure appropriate customs tax is paid," and more generally protecting harmful elements from entering the United States, "whether that be communicable diseases, narcotics, or explosives." *Id.* at 394 (internal quotation marks omitted). But those interests are only "weakly served" by searching and prohibiting the admission of a cell phone containing unlawful materials. *Id.* This is because of cloud computing. Much cell phone data does not reside on the phone, but instead on servers with which the device communicates. *Id.* Thus, "[s]topping the cell phone from entering the country would not . . . mean stopping the data contained on it from entering the country." *Id.* Rather, that data would remain accessible on the server where it is located.

Unlike physical contraband, then, which "once interdicted, will not enter the country," digital contraband on a cell phone "easily could and very likely already has." *Id.* The

9

government's interest in immediate searches for the purpose of preventing that sort of contraband from entering the United States is comparatively less compelling than the typical border needs of preventing the admission of unwanted persons or property. And when weighed against "the magnitude of the privacy invasion caused by such searches," the balance is clear: warrantless border searches of a cell phone are unreasonable under the Fourth Amendment. *Id.* at 394.

2.        Even if the Court declines to follow *Smith* and concludes that a warrant was not required to search Mr. Robinson's phone at the border, some articulable suspicion was still necessary. This, we contend, should have been probable cause or, at the bare minimum, reasonable suspicion. Because the government had neither, it violated Mr. Robinson's Fourth Amendment rights on this theory, as well.

The border-search doctrine, on its own terms, does not authorize suspicionless searches in all cases. Rather, suspicionless searches are only legal for "routine" invasions of privacy that a reasonable traveler would expect upon entering the United States. *Montoya de Hernandez*, 473 U.S. at 538; *Levy*, 803 F.3d at 122. These would include searches of a luggage, wallet, or a person's exterior—the kinds of examinations that, as the word conveys, are *routine* at airports and border-crossings every day. But suspicionless searches are prohibited for more invasive intrusions that exceed a traveler's reasonable expectations of privacy. Thus, for example, the government may subject a person to a cavity search at the border only upon a showing of reasonable suspicion. *Montoya de Hernandez*, 473 U.S. at 541. So, too, is reasonable suspicion required to detain a traveler overnight to monitor her bowel movement, *id.*, or to conduct a strip search. *United States v. Asbury*, 586 F.2d 973, 976 (2d Cir. 1978). And it is necessary to search and copy personal papers in a traveler's possession. *See United States v. Levy*, 2013 WL 664712, at *12 (S.D.N.Y. 2013), *aff'd*, 803 F.3d 120 (2d Cir. 2015).

10

The search of a cell phone is not a routine examination that a reasonable person would anticipate upon attempting to enter the United States. It is, instead, the sort of unusual invasion of privacy interests for which some articulable suspicion is required. On this point, we rely on Judge Kovner's recent decision in *United States v. Gavino*, No. 22-cr-136 (RPK) 2024 WL 85072 (E.D.N.Y. Jan. 7, 2024), holding that border cell-phone searches may only be conducted upon a showing a reasonable suspicion.[2]

*Gavino* reached this decision based upon two points of law, both discussed above. The first is that only "routine" border searches may be conducted without suspicion, while other searches that "impinge significantly on privacy or dignitary interests" require "reasonable suspicion of criminal activity." *Id.* at *4. The second is that cell-phone searches, because of the quantity and quality of private information they reveal, fall within this latter category requiring articulable suspicion. *Id.* ("*Riley*'s discussion of privacy interests establishes that searches of cell phones should be treated as intrusive border searches, rather than standard ones.").

This, *Gavino* holds, is true even for manual searches of a phone, such as the one that CBP and HSI conducted here, which are more limited than a digital forensic examination of the entire device's contents. *Cf. United States v. Cano*, 934 F.3d 1002, 1016 (9th Cir. 2019) (holding that manual border searches of cell phones may be conducted without suspicion, while forensic searches require reasonable suspicion). As the Court noted, in *Riley*, the Supreme Court drew no distinction between manual and forensic examinations of a cell phone and, in any event, held that the suspicionless manual search conducted there violated the Fourth Amendment. *Id.* "*Riley* thus establishes that even manual cell phone searches are intrusive" and "Fourth Amendment

---

[2] *Gavino* rejected our argument above that border cell-phone searches require a warrant based upon probable cause. *See* 2024 WL 85072, at *5. We maintain that *Gavino* was wrongly decided on that issue, but nevertheless agree that with its conclusion that some articulable suspicion is necessary before the government may search a person's cell phone at the border.

11

principles governing intrusive border searches therefore require law enforcement officers to have reasonable suspicion of criminal activity in order to search a traveler's cell phone." *Id.*

Here, the government lacked this suspicion. Agent Stepien's warrant applications does not mention CBP or HSI having an articulable basis to believe that evidence of any crime—much less possession of the kind of child pornography discovered during the search—would be found on Mr. Robinson's phone. *See* Ex. C ¶¶ 6-11; Ex. D ¶¶ 6-17. Indeed, those affidavits indicate that the government relied on the "routine" border search exception, which, as discussed above, frees the government from having to demonstrate any suspicion at all. Ex. C ¶ 7 n.1.

Further, during a Mirandized interview on May 16, 2023, Agent Stepien confirmed that the search was random. He explained to Mr. Robinson that: "How that works is, you flew in, Customs and Border did the border search. They found the child exploitative material. They then called us," *i.e.*, HSI. Ex. E at 19:15-19:24. In response to Mr. Robinson's subsequent question whether he was "literally, randomly" picked out for inspection, Agent Stepien replied, "yeah" and explained, "sometimes it's literally luck of the draw. They'll pull a name out of a list and they'll say they're going to check seats 1, 2, 3, whatever, and your name happened to be selected. Unlucky for you, there was something on your phone." *Id.* at 19:24-19:50.

At most, Agent Anstee's report cryptically states that CBP "received information that an inbound passenger would likely be in possession of Child Sex Abuse Material (CSAM)," "requested assistance" from HSI, and "provided information" to HSI identifying Mr. Robinson as the target. Ex. B at JR0002. But in light of Agent Stepien's statements on May 16, 2023, this "received information" appears to be the findings of CBP's randomly conducted border search of the phone. And even if this "received information" refers to something else, Agent Anstee's report does not say what it was. Certainly, it does not provide "'a particularized and objective

12

basis for suspecting the particular person stopped of criminal activity.'" *Levy*, 803 F.3d at 123 (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)). Ultimately, Agent Stepien's prior statements and omissions are the best evidence of why CBP and HSI searched the phone. They establish that the search was random and suspicionless.[3]

Accordingly, CBP and HSI's search of Mr. Robinson's cell phone was not routine but was a significant invasion of his privacy rights. Under *Riley* and *Smith*, a warrant and probable cause were necessary before the search could begin. At a minimum, as *Gavino* holds, reasonable suspicion was required. Lacking such suspicion, much less a warrant, the government violated the Fourth Amendment when it conducted the border search of Mr. Robinson's iPhone. The phone and its fruits should be suppressed.

**B.    Mr. Robinson's statements to the HSI agent were obtained in violation of the Fifth Amendment.**

Mr. Robinson was questioned by Agent Anstee after having been detained for almost three hours. During that questioning, Mr. Robinson revealed the passcodes to his iPhone and laptop. And, according to the agent, he acknowledged knowing what was on the phone, expressed concern about being arrested, and acted nervously. At no point during the questioning, however, did Agent Anstee (or anyone else) provide warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966). Nor did Mr. Robinson knowingly waive his *Miranda* rights.

---

[3] Because the government had no articulable basis to search the phone, the Court need not decide whether the government's reasonable suspicion was also sufficiently related to its governmental interest in securing the border's integrity, which courts have required for border searches of a phone. *Compare United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019) (holding that border search of phone requires reasonable suspicion that phone contains evidence of "offense that bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband."), *with Cano*, 934 F.3d at 1019-20 (holding that border search of phone requires reasonable suspicion that device contains illegal contraband, and not mere evidence of other crimes). Accordingly, we do not address this reasonable-suspicion issue her. We reserve the right to pursue it, however, in the event the government comes forward with facts to demonstrate that this was not a suspicionless search.

13

"An interaction between law enforcement officials and an individual generally triggers *Miranda*'s prophylactic warnings when the interaction becomes a 'custodial interrogation.' This determination has two parts: (a) there must be an interrogation of the defendant, and (b) it must be while she is in 'custody.'" *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011). Here, both parts are satisfied.

*First*, Agent Anstee's report of the border search states that he conducted an "interview" of Mr. Robinson regarding the cell phone, including the alleged illegal images found on it. Ex. B at JR0003. That "express questioning" of Mr. Robinson, whom the agent suspected of possessing and transporting child pornography after reviewing his phone, was "reasonably likely to elicit an incriminating response," which is sufficient to qualify as "interrogation" for purposes of *Miranda. Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). *See, e.g.*, *United States v. Moody*, 649 F.2d 124, 128 (2d Cir. 1981) (holding that Customs agents interrogated defendant when they questioned her after discovering contraband concealed in her clothing); *United States v. Carr*, 63 F. Supp. 3d 226, 238 (E.D.N.Y. 2014) (finding that CBP officers' questioning of defendant about contraband in possession was "objectively likely to elicit an incriminating response from [the defendant]—an individual under suspicion" of transporting that contraband).

*Second*, Agent Anstee's questioning occurred in "custody" because "a reasonable person in [Mr. Robinson's] position would have understood herself to be subjected to restraints comparable to those associated with a formal arrest." *FNU LNU*, 653 F.3d at 153 (cleaned up). This is so despite the questioning happening at the border, where "a reasonable traveler will expect some constraints as well as questions" and there is a "reduce[d] . . . likelihood that reasonable persons in that situation would consider themselves to be under arrest." *Id.* at 153-54; *see also United States v. Djibo*, 151 F. Supp. 3d 297, 305 (E.D.N.Y. 2015) ("[T]he likelihood that

14

a reasonable person being questioned by CBP officers on a jet way would consider himself or herself under arrest is diminished, but of course still possible." (internal quotation marks omitted)). Indeed, the circumstances of the interview exceed what is normally asked and can be expected to occur when reentering the United States.

Multiple factors bear this out. *See id.* at 153 (identifying relevant factors for determining whether defendant's interrogation was "custodial"). To begin, the interview was conducted after nearly three hours' detention. It occurred in a closed CBP office where Mr. Robinson could not communicate with his husband. CBP officers repeatedly told Mr. Robinson that he was not free to leave. *See Djibo*, 151 F. Supp. 3d at 306 (holding that questioning of defendant in private CBP area and telling him he was not free to leave contributed to custodial atmosphere). And Agent Anstee indicated to him that he was being held on suspicion that he possessed child pornography on his phone. Further, the agent asked interrogating questions that a reasonable person would not recognize as relevant to his admissibility to the United States. *See FNU LNU*, 653 F.3d at 153 (holding that "[a] reasonable person's expectations about how the questioning is likely to unfold are also relevant" to whether interrogation is custodial); *Djibo*, 151 F. Supp. 3d at 306 (holding that questions to investigate crime unrelated to admissibility made interrogation custodial).

For those reasons, and notwithstanding the lack of physical restrains applied to Mr. Robinson, the totality of the factors demonstrate that the interrogation involved restrictions comparable to a formal arrest. Unsurprisingly, according to the HSI agent's notes, Mr. Robinson subjectively reached the same conclusion and asked whether the interview was merely a prelude to being taken into criminal custody. *See* Ex. B at JR0003 ("The TARGET asked if he was going to be arrested."). *Miranda* warnings were therefore required. The government's failure to give them requires suppression of Mr. Robinson's statements during the interview, including his

nonverbal expressions of nervousness and guilt. *See Muniz v. Pennsylvania*, 496 U.S. 582, 595 n.9 (1990) (holding that Fifth Amendment privilege extends to "verbal and nonverbal conduct" that "reflects the actor's communication of his thoughts to another").

In the alternative, Mr. Robinson's statements during the interview should be suppressed because they were involuntary, in violation of the Fifth Amendment's privilege against compelled self-incrimination. *See United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (acknowledging that non-custodial statements can be suppressed if they were made involuntarily). To be suppressed, Mr. Robinson's statements must be "testimonial, incriminating, and compelled." *Hiibel v. Sixth Judicial Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 189 (2004). Mr. Robinson's statements meet all three requirements.

The statements were testimonial because they, "explicitly or implicitly, relate[d] to a factual assertion or disclose[d] information." *Id.* (quoting *Doe v. United States*, 487 U.S. 201, 210 (1988)). According to Agent Anstee, Mr. Robinson verbally indicated that he knew the contents of his phone and expressed anxiety and consciousness of guilt. Even revealing the passcode to his cell phone and computers was testimonial because it conveyed that he possessed the devices and knew how to open them. *See, e.g.*, *In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*, 670 F.3d 1335, 1345-46 (11th Cir. 2012) (holding that requiring individual "to use a decryption password . . . demand[s] the use of the contents of the mind" and "is testimonial in character"); *United States v. Booker*, 561 F. Supp. 3d 924, 935 (S.D. Cal. 2021) (finding, without government opposition, that providing cell phone passcode was testimonial); *United States v. Kirschner*, 823 F. Supp. 2d 665, 668 (E.D. Mich. 2010) (holding that witness may exercise privilege from providing password for computer). *See also Djibo*, 151 F. Supp. 3d at 306 (suppressing defendant's statement of passcode to interviewing HSI agent obtained in

16

violation of *Miranda*); *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 310-11 (S.D.N.Y. 2018) (finding, without apparent government opposition, that defendant's providing of passcode was suppressible statement).

The statements were also incriminating. Mr. Robinson conveyed that the electronic devices belonged to him, he knew how to open them, he knew what would be found in them, and he was aware there was incriminating information of them that could lead to his arrest. The government can use these statements to establish his possession of the phone and his knowledge that child pornography was on the device.

Finally, the statements were compelled, based upon "the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) (citing *Schneckloth v. Bustamante*, 412 U.S. 218, 226 (1973)); *accord Haak*, 884 F.3d at 409. Mr. Robinson has no criminal record and had never been detained by law enforcement officials before. Ex. A ¶ 14. While the interrogation was only approximately 15 minutes long and did not involve abusive conduct or physical restraints, it occurred after Mr. Robinson had been detained for approaching three hours. During that time, he was searched three times, separated from his husband, unable to communicate with anyone else, told multiple times that he was not free to leave, and was never advised of his rights to remain silent or to the assistance of an attorney.

The duration of his detention and the repeated searches of his body and property rendered the interview that followed coercive and Mr. Robinson's statements inadmissible against him. They should be suppressed for this reason, in addition to the *Miranda* violation.

17

### C.     The two-month delay in searching the laptop, SD card, and thumb drive was unreasonable.

The government seized Mr. Robinson's laptop, SD card, and thumb drive on November 14, 2022, but waited until January 17, 2023, to obtain a warrant to search them. It delayed the search despite having all the information it needed to establish probable cause. This information was the border search's finding that Mr. Robinson's iPhone contained "*several images* of what appeared to be a minor male . . . engaged in sexual activity . . . with an adult male" and "*several images* of the minor male naked," Ex. C ¶ 8 (emphases added); and Agent Stepien's training and experience that someone who possesses "*several images* depicting child pornography on one device . . . likely has a larger collection of such images stored elsewhere," Ex. D ¶ 13 (emphasis added). The two-month delay from seizure to search was unreasonably long, in violation of the Fourth Amendment.

If law enforcement agents have reason to believe that "property contains contraband or evidence of a crime and if it is necessary to seize or secure the property immediately to prevent its destruction or disappearance, the Fourth Amendment allows [them] to seize or secure the property without a warrant provided that they follow up by applying to a judge for a warrant to search the property's contents." *United States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020). But "[t]he right of the police to temporarily seize a person's property pending the issuance of a search warrant presupposes that the police will act with diligence to apply for the warrant." *Id.* And where law enforcement "'act with unreasonable delay in securing a warrant'" for a temporarily seized device, the Fourth Amendment is violated. *Id.* (quoting *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998)).

18

The government's two-month delay was an unreasonable amount of time to wait to search the laptop, SD card, and thumb drive, based on the relevant factors the Court of Appeals set forth in *Smith*, 967 F.3d at 206.

*First*, *Smith* holds that, in the mine-run case, "[i]f the police have seized a person's property for the purpose of applying for a warrant to search its contents, it is reasonable to expect that they will not ordinarily delay a month or more before seeking a search warrant." *Id.* at 206-07. It follows that a delay twice as long would ordinarily not be reasonable either, especially where the government had known all of the facts necessary for probable cause. "After all, if the police have probable cause to seize an item in the first place, there is little reason to suppose why they cannot promptly articulate that probable cause in the form of an application to a judge for a search warrant." *Id.* at 207. The length of delay therefore "weighs substantially" in Mr. Robinson's favor. *Id.*

*Second*, the seized property was important to Mr. Robinson. The laptop was his personal computer that he "used for communication and for the storage of immense amounts of personal data." *Id.* As discussed above regarding the enhanced liberty interests in a cell phone, *see supra* Part II.A, "the search and seizure of personal electronic devices like a . . . [laptop] computer implicates different privacy and possessory concerns than the search and seizure of a person's ordinary personal effects." *Id.* at 208. This enormity of those individual interests is "vital to assessing the importance of the seized property to a defendant" and favors finding that the delay in searching Mr. Robinson's temporarily seized electronic devices was unreasonable. *Id.*

*Third*, Mr. Robinson did nothing to reduce his interest in these electronic devices. *See id.* He did not consent to their seizure and search, but only provided them at the direction of CBP officers who told him that they had the lawful authority to take and examine them. Ex. A ¶¶ 5-6;

19

*see Smith*, 967 F.3d at 208 (finding no diminishment of defendant's property interests in seized tablet computer where he "did not consent to the seizure"). And while the government may have had probable cause to search the devices based on what it learned from the border search, which offset Mr. Robinson's possessory and privacy interests in them, the government's "interest was delimited by the obligation to seek a search warrant without unreasonable delay." *Id.* at 209. In other words, the seizure of his electronic devices only decreased his personal interest in them to a limited extent.

Fourth, while we do not know the government's justification for the delay, *see id.* at 210, we assume it waited to see what the full forensic search of Mr. Robinson's phone, pursuant to the November 21, 2022 warrant, would reveal. But while that forensic search of the phone strengthened the probable-cause to search the other electronic devices, it was not essential. According to Agent Stepien's warrant affidavit, the "several images" of child pornography found during the border search of the phone were sufficient to form a reasonable belief that similar images would be found on Mr. Robinson's other devices, even though no such images were found during the border search of the laptop. *See* Ex. D ¶ 13 ("Although a basic exam did not reveal the presence of CSAM on the device, a more thorough examination conducted pursuant to a search warrant is likely to reveal files containing CSAM."). The government was thus fully able to apply for and obtain a warrant to search the laptop, SD card, and thumb drive without first learning the results of the iPhone forensic examination.

Accordingly, all four *Smith* factors support the same conclusion: the two-month delay in searching the laptop, SD card, and thumb drive was unreasonable. The Court should therefore suppress this evidence.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court suppress the cell phone, laptop, SD card, and thumb drive seized from Mr. Robinson on November 14, 2022, and any derivative fruits. It should also suppress the statements he made during his interview with HSI Agent Anstee. At a minimum, an evidentiary hearing should be held to the extent there is a dispute regarding the facts of the search and seizure of the devices and the interrogation of Mr. Robinson.

Respectfully submitted,

/s/                        

Benjamin Yaster, Esq.
Federal Defenders of New York, Inc.
1 Pierrepont Plaza, 16th Floor
Brooklyn, New York 11201
(718) 330-1291
*Counsel for Jason Robinson*

21