DMP:GMR
F. # 2023R00004

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                                    Docket No. <u>23-CR-192 (NRM)</u>

JASON ROBINSON,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - X

<u>GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE</u>

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Gilbert M. Rein
Assistant U.S. Attorney
    (Of Counsel)

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................... ii

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF FACTS ................................................................. 1

ARGUMENT ................................................................................... 6

I.  THE BORDER SEARCH OF THE DEFENDANT'S PHONE CONDUCTED BY CBP
    DID NOT VIOLATE THE FOURTH AMENDMENT .................................. 7

    A. Searches of Electronic Devices During a Border Search ............................. 7

    B. The Search of the Defendant's Cell Phone Was a Routine Border Search Which Did
       Not Require a Warrant ......................................................... 9

    C. The Search of the Defendant's Cell Phone Was Supported by Reasonable Suspicion ..
       ........................................................................... 14

    D. The Good Faith Exception Applies and the Contents of the Defendant's Phone Should
       Not be Suppressed ........................................................... 16

II. THE STATEMENT TO THE HSI SPECIAL AGENT DID NOT VIOLATE THE FIFTH
    AMENDMENT .................................................................. 20

    A. Statements Made During a Border Search ...................................... 20

    B. The Defendant Was Not In Custody at the Time of His Statements to HSI and
       Miranda Warnings Were Not Required ......................................... 23

    C. The Defendant's Statements Were Voluntary .................................. 25

III. THE SEARCH OF THE DEFENDANT'S LAPTOP, USB THUMB DRIVE, AND
     MEMORY CARD WAS REASONABLE AND DID NOT VIOLATE THE FOURTH
     AMENDMENT ................................................................. 27

    A. Law Enforcement Must Promptly Obtain a Warrant to Search a Seized Device ....... 28

    B. The Delay in Searching The Additional Devices was Reasonable ................... 29

    C. The Exclusionary Rule Does Not Require Suppression ........................... 34

CONCLUSION ................................................................. 35

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

Abidor v. Napolitano,
  990 F. Supp. 2d 260 (E.D.N.Y. 2013) ............................................................. 12, 15

Alasaad v. Mayorkas,
  988 F.3d 8, 17 (1st Cir. 2021) ........................................................................ 10, 12

Berkemer v. McCarty,
  468 U.S. 420 (1984) ............................................................................................. 21

California v. Beheler,
  463 U.S. 1121 (1983) ........................................................................................... 23

Davis v. United States,
  564 U.S. 229 (2011) ............................................................................................. 34

Dickerson v. United States,
  530 U.S. 428 (2000) ............................................................................................. 25

Haynes v. Washington,
  373 U.S. 503 (1963) ............................................................................................. 26

Herring v. United States,
  555 U.S. 135 (2009) ............................................................................................. 35

Howes v. Fields,
  565 U.S. 499 (2012) ............................................................................................. 21

Lo-Ji Sales, Inc. v. New York,
  442 U.S. 319 (1979) ............................................................................................. 19

Miranda v. Arizona,
  384 U.S. 436 (1966) ............................................................................................. 20

Oregon v. Elstad,
  470 U.S. 298 (1985) ............................................................................................. 26

Oregon v. Mathiason,
  429 U.S. 492 (1977) ............................................................................................. 23

Rhode Island v. Innis,
    446 U.S. 291 (1980)............................................................................ 21

Riley v. California,
    573 U.S. 373 (2014)......................................................................... 9, 11

Stansbury v. California,
    511 U.S. 318 (1994))........................................................................ 21

Stone v. Powell,
    428 U.S. 465 (1976)........................................................................... 18

Tabbaa v. Chertoff,
    509 F.3d 89 (2d Cir. 2007) ............................................................... 8, 9

Tankleff v. Senkowski,
    135 F.3d 235 (2d Cir. 1998) ............................................................... 22

United States v. Aigbekaen,
    943 F.3d 713 (4th Cir. 2019) .............................................................. 14

United States v. Anderson,
    929 F.2d 96 (2d Cir. 1991) ................................................................. 27

United States v. Asbury,
    586 F.2d 973 (2d Cir. 1978)) .............................................................. 15

United States v. Cano,
    934 F.3d 1002 (9th Cir. 2019) .......................................... 11, 12, 14, 16

United States v. Chang,
    No. 18-CR-681 (NGG), 2024 WL 1308775 (E.D.N.Y. Mar 27, 2024) ................ 30, 31, 33, 35

United States v. Clark,
    638 F.3d (2d Cir. 2011) .................................................................. 19, 20

United States v. Corbett,
    No. 20-CR-213 (KAM), 2021 WL 4480626 (E.D.N.Y. Sept. 30, 2021) .................... 31, 33, 35

United States v. Cotterman,
    709 F.3d 952 (9th Cir. 2013) ........................................... 13, 15, 16

United States v. Daskal,
    676 F. Supp. 2d 153 (E.D.N.Y. 2023) ................................................... 29

United States v. Falso,
   544 F.3d 110 (2d Cir. 2008) ......................................................................... 19

United States v. Familetti,
   878 F.3d 53 (2017) ....................................................................................... 21

United States v. Faux,
   828 F.3d 130 (2d Cir. 2016) ..................................................................... 21, 22

United States v. Flores-Montano,
   541 U.S. 149 (2004).................................................................................... 8, 12

United States v. FNU LNU,
   653 F.3d 144 (2d Cir. 2011) ................................................................... passim

United States v. Ganias,
   824 F.3d 199 (2d Cir. 2016) ......................................................................... 18

United States v. Gavino,
   No. 22-CR-136 (RPK), 2024 WL 85072  (E.D.N.Y. Jan. 7, 2024).............. 8, 13, 15

United States v. Green,
   No. 18-CR-121 (RJA)(MJR), 2021 WL 1877236 (W.D.N.Y. Feb. 3, 2021) .................... 30, 35

United States v. Haak,
   884 F.3d 400 (2d Cir. 2018).......................................................................... 26

United States v. Irving,
   452 F.3d 110 (2d Cir. 2006) ................................................................... passim

United States v. Kamaldoss,
   No. 19-CR-543 (ARR), 2022 WL 1200776 (E.D.N.Y. Apr. 22, 2022) .................. 18

United States v. Kolsuz,
   890 F.3d 133 (4th Cir. 2018)) ....................................................................... 14

United States v. Kourani,
   6 F.4th 345 (2d Cir. 2021) ............................................................................ 26

United States v. Leon,
   468 U.S. 897 (1984)................................................................................... 18, 20

United States v. Levy,
   803 F.3d 120 (2d Cir. 2015) ........................................................................... 8

United States v. Mendez,
103 F.4th 1303 (7th Cir. 2024) ............................................................... 8, 10, 11, 12

United States v. Mendonca,
88 F.4th 144 (2d Cir. 2023) ................................................................................. 25

United States v. Molina-Isidoro,
884 F.3d 287 (5th Cir. 2018) ................................................................................ 11

United States v. Montoya de Hernandez,
473 U.S. 531 (1985)................................................................................. 8, 15

United States v. Newton,
369 F.3d 659 (2d Cir. 2004) ................................................................... 22, 23, 25

United States v. Plugh,
648 F.3d 118 (2d Cir. 2011) ................................................................................ 25

United States v. Ramirez,
No. EP-18-CR-3530-PRM, 2019 WL 3502913 (W.D. Tex. Aug. 1, 2019) ........................... 15

United States v. Ramsey,
431 U.S. 606 (1977)................................................................................................. 7

United States v. Raymonda,
780 F.3d 105 (2d Cir. 2015 ................................................................................. 18

United States v. Santillan,
902 F.3d 49 (2d Cir. 2018) ................................................................................. 22

United States v. Shvartsman,
No. 23-cr-307 (LJL), 2024 WL 1193703 (S.D.N.Y. Mar. 20, 2024) ................................ 26, 27

United States v. Smith,
673 F. Supp. 3d 381 (S.D.N.Y. 2023) ........................................................... passim

United States v. Smith,
967 F.3d 198 (2d Cir. 2020) ........................................................................ passim

United States v. Sultanov,
No. 22-CR-149 (NRM), 2024 WL 3520443 (E.D.N.Y. July 24, 2024) ........................... passim

United States v. Taylor,
745 F.3d 15 (2d Cir. 2014) ................................................................................. 27

United States v. Tineo,
   No. 23-cr-223 (DLI), 2024 WL 2862289 (E.D.N.Y. June 6, 2024) ...................... 12, 13, 17, 19

United States v. Tisdol,
   544 F. Supp. 3d 219 (D. Conn. 2021) ..................................................................... 30

United States v. Touset,
   890 F.3d 1227 (11th Cir. 2018) ............................................................. 10, 11, 12, 14

United States v. Wanjiku,
   919 F.3d 472 (7th Cir. 2019) ...................................................................................... 11

United States v. Zodhiates,
   901 F.3d 137 (2d Cir. 2018) ...................................................................................... 17

## FEDERAL STATUTES

18 U.S.C. § 2252(a)(1) ..................................................................................................... 5

18 U.S.C. § 2252(a)(4)(B) .............................................................................................. 5

## PRELIMINARY STATEMENT

The defendant moves to suppress the following: (1) his iPhone and evidence obtained during searches of that device conducted during a border search and pursuant to a judicially authorized search warrant; (2) statements he made to a Special Agent with Homeland Security Investigations ("HSI") during an interview at John F. Kennedy International Airport ("JFK Airport"); and (3) evidence obtained during judicially authorized searches of additional electronic devices. <u>See</u> ECF No 25 ("Def. Mot."). The defendant argues that this evidence was obtained in violation of the Fourth and Fifth Amendments. For the reasons set forth below, the government respectfully submits that the Court should deny the defendant's motion in its entirety.

## STATEMENT OF FACTS[1]

On November 14, 2022, the defendant arrived at JFK Airport aboard a British Airways flight from London, United Kingdom which had originated in Cairo, Egypt. After disembarking, the defendant made his way to passport control where he presented his passport to an officer with Customs and Border Protection ("CBP"). At that time, CBP was alerted to a lookout for the defendant because he was the subject of a TECS report.[2] Specifically, the information available to the CBP officers that evening indicated that the defendant was believed to possibly be in possession of child sexual abuse material ("CSAM"). As a result, at

---

[1] The facts are drawn from documents produced to the defendant as discovery in this case, including affidavits in support of two search warrants, and information that the government proffers in connection with the instant motion and would establish at an evidentiary hearing.

[2] The government understands that "TECS" is not an acronym but is the name for a system formerly known as the Treasury Enforcement Communications System.

approximately 5:35 p.m., defendant was directed to another area of passport control for an additional—or secondary—inspection.

Once he arrived for a secondary inspection, the defendant interacted with additional CBP officers. He stated to a CBP officer that he went to Egypt for vacation and did not visit other countries. Based upon the information they had received regarding the defendant's believed possession of CSAM, CBP officers decided to conduct an electronic media examination. A CBP officer asked the defendant for his electronic devices. The defendant voluntarily provided the officer with his iPhone cell phone, a laptop, and a USB thumb drive. When the devices were provided, they were powered on and unlocked. Although no password was necessary to access the devices because they were unlocked, the defendant also provided the passwords for his iPhone and laptop. Prior to any review of the devices, a CBP officer placed them in airplane mode to disable their cellular service and data connections. At approximately 5:50 p.m., a CBP officer conducted a review of the defendant's laptop but did not find any CSAM. Then, at approximately 6:20 p.m., a CBP officer conducted an examination of the defendant's iPhone and observed CSAM to be present on it. Specially, the CBP officer observed that the device had a folder which contained videos of young boys engaged in sex acts. An additional search of the defendant's baggage was conducted and CBP officers located a memory card.

After finding CSAM on the defendant's iPhone, CBP officers contacted HSI Special Agent Allen Anstee at approximately 6:45 p.m. Agent Anstee arrived at approximately 7:57 p.m. When Agent Anstee arrived, he conducted a brief, approximately three-minute, review of the contents of the defendant's iPhone. During this review, Agent Anstee observed several images of a minor male, approximately 13 to 16 years of age, engaged in anal and oral sex with

an adult male. The defendant's iPhone also included additional images of the minor male, including close up pictures of the minor male's genitals. After making these observations, Agent Anstee detained the defendant's iPhone.

Agent Anstee also interviewed the defendant following Agent Anstee's review of the defendant's iPhone. The defendant acknowledged during the interview that he understood he was not under arrest and that a border search was being conducted. During the interview, Agent Anstee observed the defendant to be nervous and fidgety. Specifically, Agent Anstee observed that the defendant did not make eye contact with Agent Anstee and appeared to be shaking. The defendant stated in substance to Agent Anstee that he knew what would be found on his devices. The defendant also asked if he would be arrested and stated in substance that his husband (with whom he had traveled to JFK Airport) did not know what was on his devices. Agent Anstee further observed that the defendant was extremely nervous and unable to even hold a glass of water in his hand.

Following the interview, the defendant was not placed under arrest. Rather, CBP completed its border inspection procedures, and the defendant was permitted to proceed into the United States. The defendant was provided with a receipt for his electronic devices which were detained by HSI pursuant to its border control authorities. These included his iPhone, his laptop, a thumb drive, and the memory card found in the defendant's luggage. No forensic search of any of these devices was performed. Rather, the manual searches described above were the only searches conducted of the defendant's devices.

On November 21, 2022, one week after the seizure of the devices, HSI Special Agent Richard Stepien applied for a warrant (the "November 2022 Warrant") to conduct a further search of the defendant's detained iPhone, an Apple iPhone XS. In support of the

application, Special Agent Stepien stated that both CBP officers and an HSI Special Agent had previously conducted a border search of the defendant's iPhone, during which law enforcement had observed CSAM. After reviewing the application, the Honorable James R. Cho, United States Magistrate Judge for the Eastern District of New York, issued a warrant authorizing a search of the defendant's iPhone.

After obtaining judicial authorization to search the defendant's iPhone, HSI, including Agent Stepien, conducted a forensic examination of the device. At least 241,872 files were reviewed. The iPhone was found to contain at least 235 images which were confirmed to be CSAM; 2,363 images classified as being age difficult;[3] 280 images depicting bestiality; and 495 images containing computer generated images of child exploitation content. The device also contained at least 457 videos confirmed to be CSAM and 579 videos classified as either age difficult or bestiality. The review determined that the majority of the videos depicted prepubescent and pubescent boys. Several videos also depicted oral and anal sexual activity involving male infants and toddlers. After an initial forensic examination of the device pursuant to the search warrant, investigators were unable to determine if certain images on the iPhone depicted the defendant personally engaged in sexual acts with children. Due to the large amount of data contained on the device, review of its contents remained ongoing into January 2023. Among other investigative steps, HSI continued to examine chats and other communications present on the device between the defendant and other individuals as they related to child exploitation.

---

[3] An image is considered to be "age difficult" when the age of individuals depicted in the material cannot be easily determined.

On January 17, 2023, while the review of the contents of the defendant's iPhone was still ongoing, Agent Stepien applied for a warrant (the "January 2023 Warrant") to search the remaining electronic devices detained during the border search, specifically, a Microsoft Surface Pro laptop, a USB thumb drive, and a Sandisk Ultra Micro SD memory card. In his application in support of the January 2023 Warrant, Agent Stepien stated that the defendant's iPhone had been searched pursuant to the November 2022 Warrant and that hundreds of images and videos depicting CSAM had been found. See Def. Mot., Ex. D, ¶ 11. Agent Stepien noted that the laptop was not found to contain CSAM during a basic inspection during the border search. Id. ¶ 13. Agent Stepien explained that, in his training and experience, given the volume of CSAM during the forensic search of the defendant's iPhone, he believed that CSAM would also be found on the other devices in the defendant's possession. Id. After reviewing Agent Stepien's application, Judge Cho issued the January 2023 Warrant authorizing a search of the defendant's laptop, USB thumb drive and memory card.

HSI subsequently executed the January 2023 Warrant and searched the laptop, USB thumb drive, and memory card. During this search, investigators observed approximately 21 images containing CSAM and four videos containing CSAM.

On May 1, 2023, a Grand Jury returned an indictment charging the defendant with Transportation of Child Pornography, in violation of 18 U.S.C. § 2252(a)(1), and Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). An arrest warrant was issued in conjunction with the indictment. On May 16, 2023, the defendant was arrested pursuant to the warrant. That same day, HSI executed a judicially authorized search warrant at the defendant's residence in Pittsburgh, Pennsylvania. At the time of his arrest, the defendant was advised of his rights in accordance with Miranda v. Arizona and subsequently agreed to speak with

investigators. In substance, he recalled having been stopped at JFK Airport during the November 2022 border search and acknowledged that CSAM was present on his phone at that time. Among other things, he stated that he had initially obtained CSAM in a chatroom after it was provided by another participant.

The investigation of the defendant's conduct remained ongoing following his arrest. Additional warrants were obtained authorizing a search of the defendant's Dropbox, Snapchat, and Instagram accounts. The defendant's Dropbox account was found to contain additional CSAM, including images and videos. Several of the videos depict young males engaged in anal and oral sex.

<u>ARGUMENT</u>

The defendant's motion to suppress the CSAM seized from his iPhone, his statements to HSI Agent Anstee, and the CSAM seized from his additional electronic devices should be denied. The defendant asserts that his iPhone, laptop, thumb drive, and memory card were searched and seized in violation of the Fourth Amendment and that his statements to Agent Anstee were obtained in violation of the Fifth Amendment. Specially, he claims (i) the manual search of his iPhone required probable cause and a warrant or reasonable suspicion, and was conducted in violation of the Fourth Amendment; (ii) he made statements to Agent Anstee even though he was not first provided with <u>Miranda</u> warnings; and (iii) the warrant authorizing a search of his laptop, thumb drive, and memory card was issued after what he claims was an undue delay in violation of the Fourth Amendment. As the government explains below, (i) the border search of the defendant's iPhone was lawful and in any event was conducted in good faith, (ii) the defendant was not in custody at the time of his statements to Agent Anstee and <u>Miranda</u> warnings were not required and (iii) the search of the defendant's additional devices

was not issued after an unreasonable delay and was conducted in good faith.  Accordingly, the defendant's motion to suppress should be denied.

I.       THE BORDER SEARCH OF THE DEFENDANT'S PHONE CONDUCTED BY CBP
         DID NOT VIOLATE THE FOURTH AMENDMENT

The defendant argues that CBP and HSI violated the Fourth Amendment by searching his iPhone.  First, relying largely on the non-binding authority of United States v. Smith, 673 F. Supp. 3d 381 (S.D.N.Y. 2023), he asks the Court to employ a restrictive approach to the Fourth Amendment's border search exception by holding that probable cause and a warrant are required for a cell phone border search.  Alternatively, he argues that border searches of electronic devices must at least be supported by reasonable suspicion, which he claims the government lacked.

At the outset, the government is mindful of this Court's recent decision in United States v. Sultanov, and its finding that a warrant, supported by probable cause, is required for the search of a cell phone at the border.  No. 22-CR-149 (NRM), 2024 WL 3520443, at *20-23 (E.D.N.Y. July 24, 2024).  For the reasons set forth below, the government respectfully disagrees and submits that cell phones are subject to search under CBP's traditionally broad authority to conduct searches at the border.  In any event, for the reasons discussed by this Court in Sultanov, the good faith exception applies to the forensic search of the defendant's cell phone in this case. See id. at *26-28.

A.       Searches of Electronic Devices During a Border Search

"The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country."  United States v. Ramsey, 431 U.S. 606, 620 (1977).  This is because, as the Supreme Court instructs, "[t]he Government's interest in preventing the entry of unwanted

persons and effects is at its zenith at the internation border." See United States v. Flores-Montano, 541 U.S. 149, 152 (2004). The border-search exception to the Fourth Amendment's warrant requirement broadly enables law enforcement agents to conduct routine, warrantless searches at points of entry, including airports, for, among other purposes, interdicting contraband. See United States v. Montoya de Hernandez, 473 U.S. 531, 537-39 (1985); see also United States v. Irving, 452 F.3d 110, 123 (2d Cir. 2006) ("An airport is considered the functional equivalent of a border and thus a search there may fit within the border search exception."). Meanwhile, nonroutine border searches, which are determined by weighing the degree of intrusion "against the level of warranted suspicion," require reasonable suspicion of criminal activity. Irving, 452 F.3d at 123. "Routine or otherwise, searches at the border 'never' require a warrant or probable cause." United States v. Mendez, 103 F.4th 1303, 1308 (7th Cir. 2024) (citing Ramsey, 431 U.S. at 619)).

The Second Circuit has long favored an expansive view of border search authority that facilitates crucial governmental objectives like preventing dangerous individuals and contraband from entering the country. See United States v. Levy, 803 F.3d 120, 124 (2d Cir. 2015) ("CBP officers … [can search] items at the border when they reasonably suspect that the traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their official duties."); see also United States v. Gavino, No. 22-CR-136 (RPK), 2024 WL 85072, at *5–6 (E.D.N.Y. Jan. 7, 2024) (finding that the Second Circuit construes border search authority more broadly than the Ninth and Fourth Circuits). In other words, in this Circuit, it is "well established that the government has broad powers to conduct searches at the border even where … there is no reasonable suspicion that the prospective entrant has committed a crime." Tabbaa v. Chertoff, 509 F.3d 89, 97 (2d Cir. 2007) (collecting cases).

This legal foundation affords substantial leeway to federal law enforcement officers in performing border searches even without reasonable suspicion or probable cause. For example, the Second Circuit has concluded that, at the border, conduct like "fingerprinting and photographing . . . does not take the searches out of the realm of what is considered routine." See id. at 99. Similarly, in Irving, the Second Circuit defined routine border searches as activities like inspecting an individual's "clothing, luggage, a purse, wallet, pockets, or shoes… [and other acts that] do not substantially infringe on a traveler's privacy rights." See 452 F.3d at 123. Using this broad definition, the court determined that customs agents merely conducted a routine airport search by looking through the luggage of a defendant they knew was a suspect in a nationwide child sex tourism investigation. Id. at 114–15, 123–24. Notably, the court averred that a routine inspection can stem from a criminal investigative motive because "it would make little sense to allow random searches of any incoming passenger, without reasonable suspicion, but require reasonable suspicion for searches of passengers that are suspected of criminal activity." Id. at 123 (internal citations omitted).

B.     The Search of the Defendant's Cell Phone Was a Routine Border Search Which Did Not Require a Warrant

Contrary to this Circuit's traditionally broad approach, the defendant urges the Court to curtail the border search exception's scope by subjecting it to the logic of Riley v. California, 573 U.S. 373, 401 (2014), which held that police generally need a warrant to search a defendant's cell phone seized incident to an arrest. Def. Mem. at 8–10.

In support of his argument, the defendant points to Smith, in which a district court in the Southern District of New York applied "the logic and analysis of Riley to the border context" in ruling that "phone searches at the border generally require warrants outside exigent circumstances." See 673 F. Supp. 3d at 396, 398. There, upon the defendant's arrival at Newark

Airport, federal law enforcement agents forensically copied his cell phone's data to further an investigation into gang activity.  See id. at 387–89.  Over a month later, after having partially reviewed the extraction, the government obtained a warrant and completed searching the device.  See id. at 388–89.  In adjudicating the defendant's motion to suppress, the court concluded that the "warrantless search of [this] cell phone was unreasonable under the Fourth Amendment."  Id. at 398.  Specifically, the court stated, among other things, that applying Riley to the border search context revealed that the profound privacy interest associated with smartphones outweighed what it termed the government's comparably weak interest in interdicting contraband, especially because illicit content on cell phones can enter the country digitally.  See id. at 394–96.  Regardless, the court ultimately declined to suppress the evidence due to the good faith exception to the exclusionary rule.  See id. 401–05.  Following the defendant's submission of his motion to suppress, this court decided Sultanov, which similarly held that a warrant was required for the search of a cell phone at the border.  2024 WL 3520443, at *20-23.

There are multiple reasons why the government respectfully maintains that probable cause and a warrant are not required for a search of an electronic device at the border.  First, notwithstanding this court's ruling in Sultanov, numerous other courts, including every Circuit court to have considered the question, have rejected similar attempts to apply Riley in the border search exception context.  See, e.g., Mendez, 103 F.4th at 1308 (distinguishing the rationale for searches incident to arrest and those conducted at the border); United States v. Touset, 890 F.3d 1227, 1234 (11th Cir. 2018) ("Our [circuit's precedent makes] clear that Riley, which involved the search-incident-to-arrest exception, does not apply to searches at the border."); Alasaad v. Mayorkas, 988 F.3d 8, 17 (1st Cir. 2021) ("Riley does not command a warrant requirement for border searches of electronic devices nor does the logic behind Riley

compel us to impose one."); see also, e.g., United States v. Wanjiku, 919 F.3d 472, 485 (7th Cir. 2019) ("No circuit court, before or after Riley, has required more than reasonable suspicion for a border search of cell phones or electronically-stored data."); United States v. Molina-Isidoro, 884 F.3d 287, 292 (5th Cir. 2018) ("Not a single court addressing border searches of computers since Riley has read it to require a warrant.").  One common refrain in this chorus is that the government's interests are more heavily weighted in a border search exception analysis than a search-incident-to-arrest inquiry.  See United States v. Cano, 934 F.3d 1002, 1015-16 (9th Cir. 2019); see also Touset, 890 F.3d at 1234–36 (holding that Riley is limited to the search-incident-to-arrest exception and does not undermine the government's interest in protecting the border, particularly as it pertains CSAM interdiction efforts).  Further, the Riley Court's decision was premised in part on its conclusion that the primary government interests to be weighed in connection with an arrest – including officer safety and destruction of evidence – did not carry the same weight when it came to searching the data on a cell phone seized incident to arrest.  See Mendez, 103 F.4th at 1308 (citing Riley, 573 U.S. at 386)).  On the contrary, in the context of a border search – a mechanism justified by the government's significant interest in protecting the border – "warrantless electronic device searches are essential."  See id. (quoting Alasaad, 988 F.3d at 17).

Second, carving out electronic devices from routine border search authority would undermine the government's national security efforts.  The defendant asserts that, under Smith, the government's interest in embargoing contraband is far weaker for digital than physical material as the former can and does frequently enter the country via the internet, cloud, or other digital means.  See Def. Mot. at 9-10.  However, the defendant's argument downplays the extent to which the courts have long recognized routine border searches as a vital tool for achieving the

government's "paramount" goal of ensuring territorial integrity by preventing the introduction of myriad "unwanted persons and effects" into the country, which necessarily includes CSAM. See e.g., Flores-Montano, 541 U.S. at 152–53 (collecting cases). Indeed, at least one Circuit has explicitly rejected the argument the defendant rasies, explaining "[t]hat digital contraband like child pornography can pass into the country electronically or be accessed remotely does little to diminish the government's interest in preventing its physical entry into the country." See Mendez, 103 F.4th at 1309 (citing Touset, 890 F.3d at 1235). Most, fundamentally, though, the defendant's argument understates the fact that crimes—not to mention evidence related to such activity—are frequently conducted on or facilitated by cell phones. See United States v. Tineo, No. 23-cr-223 (DLI), 2024 WL 2862289, at *6 (E.D.N.Y. June 6, 2024). Whether contraband on a cell phone can also be accessed remotely does not acknowledge the significant government interest in ensuring that crimes and criminal activity conducted on or facilitated by cell phones are appropriately interdicted or disrupted by searches conducted at the border. Accordingly, especially "[g]iven the volume of travelers passing through our nation's borders, warrantless electronic device searches are essential to the border search exception's purpose of ensuring that the executive branch can adequately protect the border." See Alasaad, 988 F.3d at 17.

Third, it is crucial to note that, in the instant case, the defendant is charged with possessing and transporting child pornography, material that has been singled out as a form of digital contraband that the government has a "strong interest" in excluding from the country. See Cano, 934 F.3d at 1014-15; see also, e.g., Abidor v. Napolitano, 990 F. Supp. 2d 260, 263-64 (E.D.N.Y. 2013) ("In the 21st century, the most dangerous contraband is often contained in laptop computers or other electronic devices… [this includes] despicable images of child pornography.") (quoting former Department of Homeland Security Secretary Michael Chertoff);

United States v. Cotterman, 709 F.3d 952, 960-61, 966-68 (9th Cir. 2013) (balancing privacy interests and the government's "legitimate" interest in interdicting CSAM by imposing a reasonable suspicion standard for forensic—but not manual—laptop border searches); Tineo, 2024 WL 2862289, at *5–6 (noting that CSAM is the only example of digital contraband of which the court is aware while refusing to limit border search authority to instances in which law enforcement is seeking digital contraband). Indeed, whether the CSAM can also be accessed remotely does nothing to protect the government interest in preventing and disrupting the possession and transport of CSAM into the country across an international border.

In short, the government respectfully submits that the government's vital stake in keeping a uniquely harmful form of digital contraband out of the country should weigh more heavily in the Fourth Amendment analysis than the significant privacy interests associated with cell phones and the nonphysical nature of illicit material contained thereon.

Separately, the government also disagrees with the defendant's assertion that manual border searches of cell phones are nonroutine and therefore must be supported by reasonable suspicion. See Def. Mot. at 11-12. Specifically, the defendant cites a recent case in this District where a court refused to adopt Smith's warrant standard[4] while still finding that, under Riley, manual border searches of cell phones are nonroutine. See Gavino, 2024 WL 85072, at *4-6. Since the defendant's motion was filed, this Court has also found "that a manual

---

[4] The court reasoned, that "the Smith court does not explain why a cell-phone search—while no doubt sensitive—should be treated as more intrusive than strip searches, alimentary canal searches, or the other intrusive searches for which reasonable suspicion has long been treated as striking the appropriate balance of interests." Gavino, 2024 WL 85072, at *6. Thus, the Gavino court found that, contrary to Smith, "in the Second Circuit, reasonable suspicion of criminal activity suffices to justify a cell phone border search." Id.

search of a cell phone at the border is a nonroutine search to which a categorical border search exception does not apply."  Sultanov, 2024 WL 3520443, at 20.

However, while "the level of intrusion into a person's privacy is what determines whether a border search is routine," Irving, 452 F.3d at 123, Circuit courts adjudicating this issue post-Riley have consistently found that manual border searches of electronic devices—though not always forensic ones—are routine.  See, e.g., Touset, 890 F.3d at 1233 ("We see no reason why the Fourth Amendment would require suspicion for a forensic [border] search of an electronic device when it imposes no such requirement for a search of other personal property."); Cano, 934 F.3d at 1016 ("[W]e hold that manual searches of cell phones at the border are reasonable without individualized suspicion, whereas the forensic examination of a cell phone requires a showing of reasonable suspicion."); United States v. Aigbekaen, 943 F.3d 713, 728 (4th Cir. 2019) (citing United States v. Kolsuz, 890 F.3d 133, 137, 144 (4th Cir. 2018)) (holding that manual border searches of electronic devices are routine while forensic ones are nonroutine)).  Thus, reasonable suspicion was not necessary to support the manual search of the defendant's phone that was conducted in this case.

C.    The Search of the Defendant's Cell Phone Was Supported by Reasonable Suspicion

Even had reasonable suspicion been required to conduct a manual search of the defendant's cell phone, as described above, CBP and HSI possessed the requisite suspicion. Therefore, as explained below, the border search was justified.

When determining whether law enforcement agents' investigative activity crossed into nonroutine border search territory, courts consider factors "including unusual conduct of the defendant, discovery of incriminating matter during routine searches, computerized information showing propensity to commit relevant crimes, or a suspicious itinerary."  See Irving, 452 F.3d

at 124 (citing United States v. Asbury, 586 F.2d 973, 975-76 (2d Cir. 1978)).  Based on this framework, "reasonable suspicion is a relatively low standard and border officials are afforded deference due to their training and experience."  Abidor, 990 F. Supp. 2d at 282 (citing Montoya de Hernandez, 473 U.S. at 542).  In fact, satisfying this standard "requires only a particularized and objective basis for suspecting the particular person stopped of criminal activity, based on the totality of the circumstances."  Gavino, 2024 WL 85072, at *6 (internal quotation marks and citations omitted).  Indeed, in Gavino, despite taking the position that reasonable suspicion is required to manually conduct a cell phone border search, the court nevertheless upheld the validity of the search in question as law enforcement agents reasonably suspected the defendant of engaging in drug trafficking.  See id.  Thus, even if a search is intrusive to the point that it may be nonroutine, it is justified so long as it is undergirded by reasonable suspicion.

Regarding border searches involving CSAM, courts have held that agents' awareness of an individual's involvement in a criminal investigation or a TECS hit can significantly factor into a reasonable suspicion finding.  See, e.g., Cotterman, 709 F.3d at 968-69; United States v. Ramirez, No. EP-18-CR-3530-PRM, 2019 WL 3502913, at *15 (W.D. Tex. Aug. 1, 2019) (holding that CBP had reasonable suspicion to inspect a defendant's cell phone where his TECS record indicated that he "was linked to the purchase of child pornography" and he consented to the search); Irving, 452 F.3d at 114–15, 124 (declining to decide if CSAM uncovered from diskettes and undeveloped film found in the defendant's luggage was obtained in a nonroutine search as law enforcement agents reasonably suspected criminal activity given that, among other things, the defendant was named in an investigation into pedophiles traveling to Mexico to abuse children).  For instance, in Cotterman, CBP initiated a border search of the defendant's laptop after seeing a TECS entry indicating that he was a sex offender "who was

potentially involved in child sex tourism." 709 F.3d at 957. In finding that agents had reasonable suspicion to forensically inspect the laptop after password-protected files were manually found thereon, the court noted that "an alert regarding possession of this type of criminal contraband justified obtaining additional resources … to properly determine whether illegal files were present." See id. at 970. Thus, the TECS hit was a core part of the court's determination that agents "certainly had more than an inchoate and unparticularized suspicion or hunch of criminal activity to support their decision to more carefully search for evidence of child pornography." See id. (internal quotation marks and citation omitted).

Here, contrary to the defendant's claim that CBP and HSI lacked "an articulable basis to believe that evidence of any crime … would be found on [the defendant's] phone," see Def. Mot. at 12, the reasonable suspicion standard was readily satisfied. The TECS record available to CBP stated that the defendant was suspected of possibly possessing CSAM, a form of digital contraband that the government has a strong interest in interdicting at the border. See Cano, 934 F.3d at 1014-15. Accordingly, based on their training and experience, CBP and HSI reasonably suspected that this may well be the case. Therefore, akin to Irving, it was reasonable that CBP and HSI initiated a routine border search of the defendant's iPhone. 452 F.3d at 123. Indeed, a brief manual search conducted after obtaining the defendant's phone revealed that the agents and TECS report were correct. Therefore, even under a more exacting standard, the search in question was supported by reasonable suspicion and the contents of the defendant's phone should not be suppressed.

D.    The Good Faith Exception Applies and the Contents of the Defendant's Phone Should Not be Suppressed

Ultimately, should the Court, as it did in Sultanov, 2024 WL 352044, at *22, hold that probable cause and a warrant are necessary to conduct a search of an electronic device at the

border, or find that reasonable suspicion was necessary to search the defendant's iPhone and that law enforcement agents failed to satisfy that standard, the evidence obtained from his phone should still not be suppressed. This is because, as the Court recognized in <u>Sultanov</u>, 2024 WL 352044, at *27-28, the good faith exception to the exclusionary rule applies. This exception covers unlawfully obtained evidence "when the [g]overnment acts with an objectively reasonable good-faith belief that their conduct is lawful." <u>United States v. Zodhiates</u>, 901 F.3d 137, 143 (2d Cir. 2018) (internal citation omitted).

In this Circuit, multiple courts have applied the good faith exception to the exclusionary rule in cases involving border searches of electronic devices. For instance, the <u>Tineo</u> court upheld the validity of a warrantless border search of a cell phone and noted that, while no constitutional violations occurred in that case, even if such violations had taken place, suppression would be inappropriate under the good faith exception because, among other things, law enforcement agents acted pursuant to a warrant. <u>See</u> 2024 WL 2862289, at *7. Moreover, even the <u>Smith</u> court declined to suppress evidence obtained from an extraction of the defendant's cell phone because it found that the good faith exception to the exclusionary rule applied. <u>See</u> 673 F. Supp. 3d at 401-05. Crucially, the <u>Smith</u> court reasoned that law enforcement agents may have reasonably believed that existing precedent provided a legal basis for searching the cell phone, the government had "an objectively reasonable suspicion of Smith's involvement in criminal activity," and officers ultimately obtained a warrant before completing their review of an extraction of the device. <u>See</u> <u>id.</u>

Here, as in <u>Smith</u>, law enforcement agents were fully justified in believing that their actions fell within the purview of their border search authority. As detailed above, a reasonable officer or agent could believe that the search in question was routine or, even if it was

nonroutine, that there was sufficient reasonable suspicion to sustain their actions. Either belief would be eminently reasonable given that, at the time of the search in November 2022, Smith and Sultanov had not yet been decided. Indeed, even if the search here had post-dated those cases "a prior holding by a district court cannot establish a binding principle of law sufficient to undermine an agent's good faith…." See United States v. Raymonda, 780 F.3d 105, 119 (2d Cir. 2015. As such, CBP and HSI acted in reasonable reliance on Second Circuit and Supreme Court precedent that "at most reasonable suspicion [is] required for some more intrusive searches." See United States v. Kamaldoss, No. 19-CR-543 (ARR), 2022 WL 1200776, at *12 (E.D.N.Y. Apr. 22, 2022).

Here, as in Smith, Tineo, and Sultanov, law enforcement agents completed their investigation pursuant to a warrant. In fact, just one week after the initial border search, Agent Stepien obtained a warrant to search the defendant's iPhone. Accordingly, the bulk of this investigation's fruits were uncovered after a magistrate judge found that there was probable cause to search the defendant's cell phone. Thus, in this case, "suppression is inappropriate [because the agent's] reliance on [the] warrant was objectively reasonable." See, e.g., Smith, 673 F. Supp. 3d at 402-04 (quoting United States v. Ganias, 824 F.3d 199, 223 (2d Cir. 2016) (en banc)).

As the Supreme Court instructs in the context of the exclusionary rule, "when law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system." United States v. Leon, 468 U.S. 897, 908 (1984) (citing Stone v. Powell, 428 U.S. 465, 490 (1976)). Applying the exclusionary rule indiscriminately and suppressing evidence even when such action is likely to have little deterrent effect on law

enforcement will "generate disrespect for the law and administration of justice." Id. (citing

Stone, 428 U.S. at 491). For this reason, typically, "searches conducted pursuant to a[n]

[objectively reasonable reliance on] a warrant are sufficient to establish that a law enforcement

officer has acted in good faith in conducting the search." Tineo, 2024 WL 2862289, at *7

(citing Leon, 468 U.S. at 922) (internal quotation marks omitted)). Ultimately, so long as law

enforcement officers acted in good faith, evidence obtained pursuant to an invalid warrant will

not be excluded except in the following situations:

> (1) where the issuing [judge] has been knowingly misled; (2) where the issuing [judge] wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient … that reliance upon it is unreasonable.

United States v. Falso, 544 F.3d 110, 125 (2d Cir. 2008) (internal citations omitted).

In this case, none of the factors which may defeat the good faith exception to the

Fourth Amendment's warrant requirement are present. First, there is simply no evidence or even

a suggestion that the issuing magistrate judge was misled. A magistrate judge is misled when the

affidavit includes false or misleading statements. Id. at 126. Here, there is no allegation that the

affidavit in support of the search warrant was based on false or misleading information. Second,

there is no basis to conclude that the issuing judge abandoned his judicial role. Such

abandonment occurs when the issuing judge allows himself to become "an adjunct law

enforcement officer," and a member of a "police operation." See United States v. Clark, 638

F.3d 89, 100-01 (2d Cir. 2011) (quoting Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 327

(1979)). Third, the warrant affidavit included adequate probable cause and is not susceptible to

any allegation that a lack of probable cause rendered reliance on it unreasonable. Affidavits

which provide detailed factual allegations, as here, "almost invariably demonstrate reasonable

reliance." Id. at 103.  Indeed, the affidavit contains detailed factual allegations regarding the contents of defendant's phone, including citing observations by both a CBP officer and HSI agent about the presence of CSAM on the device.  Def. Mot., Ex. C, ¶¶ 7-8.  Finally, the warrant was not facially deficient because it "particularized the place to be searched and the things to be seized."  Clark, 638 F.3d at 101 (quoting Leon, 468 U.S. at 923).  Here, the place to be searched—the iPhone—was particularly described by both its make, model, serial number, and international mobile equipment identity number.  Def. Mot., Ex. C, ¶ 4.  Further, the warrant's attachment B specifically described the items to be seized during a search of the defendant's iPhone.  Id. at 19-20.

The defendant's motion to suppression his iPhone and its contents should be denied.

II.     THE STATEMENT TO THE HSI SPECIAL AGENT DID NOT VIOLATE THE FIFTH AMENDMENT

The defendant next argues that his statements made to HSI Special Agent Allen Anstee should be suppressed because he was not provided with Miranda warnings prior to speaking with the agent.  Although the government agrees that the defendant was interrogated by the HSI agent, it respectfully submits that the defendant was not in custody and therefore Miranda warnings were not required.

A.     Statements Made During a Border Search

A defendant subjected to custodial interrogation must be advised of his right to remain silent and to consult with an attorney.  Miranda v. Arizona, 384 U.S. 436, 471 (1966).  "Custodial interrogation" refers to "questioning initiated by law enforcement after a person has been taken into custody."  Id. at 444.  The provision of Miranda warnings is triggered not simply

by custody or interrogation but by both occurring together.  See Rhode Island v. Innis, 446 U.S. 291, 300 (1980) ("[T]he special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation.").

Interrogation occurs when a person "is subjected to express questioning or its functional equivalent."  Id. at 300-01.  It involves "not only … express questioning, but also … any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response…."  Id.  at 301.  It follows then that not all questions or words used by law enforcement will be considered interrogation.  See United States v. Familetti, 878 F.3d 53, 57 (2017).

"'[C]ustody' for Miranda purposes is not coterminous with, though it is often informed by, the colloquial understanding of custody."  United States v. FNU LNU, 653 F.3d 144, 152-53 (2d Cir. 2011).  "Not all restraints on freedom of movement amount to custody for purposes of Miranda."  Howes v. Fields, 565 U.S. 499, 509 (2012).  The inquiry depends not on the subjective beliefs of a law enforcement official or a suspect, but rather on how a reasonable person under the circumstances would view the situation.  See FNU LNU, 653 F.3d at 151 (citing Stansbury v. California, 511 U.S. 318, 323 (1994)).  As part of its inquiry, a court considering whether a defendant was in custody at the time of an interrogation must look at "all the surrounding circumstances" and ask, "how a reasonable [person] in the suspect's position would have understood his situation."  United States v. Faux, 828 F.3d 130, 135 (2d Cir. 2016) (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)).  This is an objective inquiry, requiring a determination about "(1) 'whether a reasonable person would have thought he was free to leave the police encounter at issue' and (2) whether 'a reasonable person would have

understood his freedom of action to have been curtailed to a degree associated with a formal arrest." Id. (quoting United States v. Newton, 369 F.3d 659, 672 (2d Cir. 2004)).

The context under which an interrogation occurs further informs a court's determination about whether a person was in custody at the time they made a statement to law enforcement. See FNU LNU, 653 F.3d at 154. For example, a reasonable person would assume a traffic stop to be relatively brief and to be focused on a driver's conduct on the road, making it uncoercive and mitigating the need for Miranda warnings. Id. at 153. Similarly, a traveler arriving at an international border, including an airport, can be expected to be faced with "compulsory questioning," to be deprived for a time of freedom of movement and to be required to submit to "some degree of confinement and restraint." Id. The traveler should expect to be asked questions about their "citizenship, authorization to enter the country, destination, baggage, and so on." Id. at 153-54.

Several additional factors inform the ultimate determination about whether a person may reasonably be considered to have been in custody. See Faux, 828 F.3d at 135 (citing FNU LNU, 653 F.3d at 153). As the Supreme Court has instructed, these include "(1) the location of questioning, (2) its duration, (3) statements made during the interview, (4) the presence or absence of physical restraints during the questioning, (5) and the release of the interviewee at the end of questioning." See Howes, 565 U.S. at 509 (collecting cases); see also, United States v. Santillan, 902 F.3d 49, 60-61 (2d Cir. 2018) (citing Tankleff v. Senkowski, 135 F.3d 235, 243-44 (2d Cir. 1998)) ("[R]elevant factors are whether the suspect is told that he or she is free to leave, the location and atmosphere of the interrogation, the language and tone used by the law enforcement officers, whether the subject is searched or frisked, and the length of the interrogation."). Whether a person is directly told that they are not under arrest is an important

factor to be considered.  See Newton, 369 F.3d 659, 676 (2d Cir. 2004).  An additional relevant factor is whether "weapons were present and especially whether they were drawn."  FNU LNU, 653 F.3d at 153.  While the nature of the questions asked by an interviewer is important, no one factor is dispositive, and a Court must consider the totality of the circumstances.  See id. at 154-55.  "[A] noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'"  California v. Beheler, 463 U.S. 1121, 1124 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  Further, Miranda warnings are not required simply because a law enforcement officer has probable cause to arrest the person they are interviewing.  FNU LNU, 653 F.3d at 150 .

   B.   The Defendant Was Not In Custody at the Time of His Statements to HSI and
        Miranda Warnings Were Not Required

        The defendant, an international traveler who was returning to the United States, was not in custody at the time he was interviewed by Agent Anstee and therefore Miranda warnings were not required.  Although the defendant was taken to a private room where Agent Anstee spoke to him regarding his secondary inspection and cell phone, the location and nature of the discussion are but two factors to consider in a wider analysis.  See id. at 154-55.  At the time of the interview, the defendant was not handcuffed and was informed that he was not under arrest.  Indeed, as recounted in Agent Anstee's report, the defendant acknowledged that he understood that he was not under arrest and that a border search was being conducted.  See Def. Mot., Ex. B.  Moreover, at the conclusion of the interview and after the defendant had completed all of his CBP border checks, he was permitted to enter the United States, thus corroborating that he was not under arrest.

The duration of Agent Anstee's interview with the defendant further demonstrates that the defendant was not in custody. As the defendant admits, he was only interviewed by Agent Anstee for "approximately 10 or 15 minutes." Def. Mot, Ex. A, ¶ 12. Courts have found that defendants were not in custody in cases where interviews lasted for far longer periods of time. For example, in FNU LNU, after reviewing the totality of the circumstances, the Second Circuit found that the defendant was not in custody even though she was interrogated by a CBP officer for 90 minutes. 653 F.3d at 154-55.

To be sure, the defendant's entire secondary inspection, during which he first interacted with CBP officers and was mostly in a sitting area, lasted approximately three hours and this is a factor to consider in the totality-of-circumstances analysis. However, the defendant's motion papers incorrectly describe the chronology of events. They also contain instances of internal inconsistency. For example, the defendant's motion states that "the interview was conducted after nearly three hours' detention." Def. Mot. 15. In the defendant's affidavit, he states that the HSI agent arrived to meet with him "[a]t approximately 8 p.m." This was approximately two and a half hours after the defendant was first directed to a secondary inspection and a full hour before the defendant was told he was free to go and left the secondary inspection area. Indeed, approximately a third of the time the defendant spent in the secondary inspection area occurred after the interview with Agent Anstee concluded and is thus not relevant to the question of whether he was in "custody" at the time of the interview.

Further review of the totality of the circumstances demonstrates that the defendant was not in custody. As stated previously, the defendant was informed that he was not under arrest and indicated that he understood. This is an important factor to consider when making the objective determination regarding whether a defendant was in custody, especially in

circumstances where the defendant was unrestrained.  See Newton, 369 F.3d at 676.  The

defendant was not handcuffed and, other than being instructed that he could not leave the

secondary inspection area, was not restrained in any way.  In addition, none of the law

enforcement officers or agents involved in the defendant's secondary inspection displayed a

weapon and the defendant was not subjected to practices ordinarily associated with an arrest,

such as fingerprinting.  This is in contrast to FNU LNU, where the defendant was escorted

directly to a private room by armed guards, fingerprinted and told she could not leave. 653 F.3d

at 146-47.  Yet, even under those circumstances, which the government submits are more akin to

a formal arrest then those present in the instant case, the Court ultimately found under the

"totality of the circumstances" that the defendant was not in custody.  Id.  at 155.  This was

because officers did not draw their weapons, the defendant was not physically restrained, and –

in the Court's view – all of the questions asked appeared relevant to the defendant's admissibility

to the county.  Id.  Finally, in the present case, the defendant was not ultimately arrested and was

allowed to go on his way.  Under these circumstances, a reasonable person examining the

circumstances would conclude that the defendant was not in custody and therefore Miranda

warnings were not required.

     C.    The Defendant's Statements Were Voluntary

     The Fifth Amendment requires that a defendant's statements have been made

voluntarily before they may be admitted in evidence against him at trial.  Dickerson v. United

States, 530 U.S. 428, 433 (2000).  A statement is voluntary when it is "the product of a free and

deliberate choice rather than intimidation, coercion, or deception."  United States v. Mendonca,

88 F.4th 144, 163 (2d Cir. 2023) (quoting United States v. Plugh, 648 F.3d 118, 127 (2d Cir.

2011)).  The Fifth Amendment's protection against self-incrimination is violated when a

statement is obtained thorough methods which offend due process or when a "suspect clearly had

no opportunity to exercise 'a free and unconstrained will.'" See Oregon v. Elstad, 470 U.S. 298, 304 (1985) (quoting Haynes v. Washington, 373 U.S. 503, 514-15 (1963)).  Evaluating whether a defendant's statement was voluntarily made, generally requires an examination of "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." Mendonca, 88 F.4th at 164 (quoting United States v. Haak, 884 F.3d 400, 409 (2d Cir. 2018)).  The inquiry requires a determination of whether "the defendant's will was overborne." United States v. Shvartsman, No. 23-cr-307 (LJL), 2024 WL 1193703, at *26 (S.D.N.Y. Mar. 20, 2024) (quoting United States v. Kourani, 6 F.4th 345, 351-52 (2d Cir. 2021)).

Here, the defendant's statements to Agent Anstee were voluntary.  The government is unaware of any characteristic of the defendant which would make him uniquely "prone to coercion." Shvartsman, 2024 WL 1193703 at *27 (reviewing a defendant's characteristics and finding him to be intelligent and understanding of his situation).  Nor does the defendant identity any such characteristic in his motion to suppress.  Agent Anstee's notes of his encounter with the defendant reflect that the defendant appeared understanding of the circumstances.  Def. Mot., Ex. B ("The TARGET advised that he understood that he was not under arrest and that the Border Search was being conducted.").

There is also nothing about the conditions of the defendant's interview which indicate that it was conducted under coercive circumstances.  Other than his concern about the length of time he was kept in the secondary inspection area, the defendant's declaration appended to his motion papers, Def. Mot, Ex. A, does not identify any condition that would have contributed to a coercive atmosphere.  There is no indication that the defendant was denied

access to the restroom, food or water.  See Shvartsman, 2024 WL 1193703, at *27 (exploring factors which might render a statement involuntary).

Moreover, other factors demonstrate the voluntariness of the statements, including the length of the defendant's interview with Agent Anstee.  As described above, the entire interview was only approximately fifteen minutes long, far shorter than other interviews which have been found to be voluntary.  See id. (collecting cases).  Further, the conduct of the law enforcement official involved—in this case Agent Anstee—contributed to the voluntariness of the defendant's statements.  The defendant's declaration makes no reference to any threats or intimidation on the part of Agent Anstee or any of the CBP officers involved in his secondary inspection.  In fact, Agent Anstee specifically told the defendant that he was not under arrest, see Def. Mot., Ex. B, and the defendant was not physically restrained at any time during the secondary inspection.  Under the totality of the circumstances, the defendant's statements to Agent Anstee were voluntary and suppression is not warranted.  See United States v. Taylor, 745 F.3d 15, 23-24 (2d Cir. 2014) (quoting United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991)) (explaining that a voluntariness inquiry must examine the "totality of the circumstances).

III.     THE SEARCH OF THE DEFENDANT'S LAPTOP, USB THUMB DRIVE, AND MEMORY CARD WAS REASONABLE AND DID NOT VIOLATE THE FOURTH AMENDMENT

Relying on United States v. Smith, 967 F.3d 198, 205 (2d Cir. 2020), the defendant argues that evidence obtained following the search of his laptop, a USB thumb drive, and a memory card should be suppressed because the delay in obtaining a warrant to search those devices was unreasonable.  Def. Mot. 18.  However, law enforcement was actively investigating the defendant's conduct, including reviewing the contents of his cell phone pursuant to a prior search warrant, before obtaining a warrant for his additional devices.  Therefore, any delay in obtaining the subsequent warrant was justified and defendant's motion should be denied.

A.     Law Enforcement Must Promptly Obtain a Warrant to Search a Seized Device

In United States v. Smith, the Second Circuit considered the Fourth Amendment implications of law enforcement's delay in seeking a warrant to search an electronic device. 967 F.3d at 202. There, a New York State Police trooper observed the defendant with a tablet displaying an image of possible child pornography. Id. at 202. The trooper seized the tablet but did not seek a search warrant for over one month. Id. at 203. The Second Circuit found this delay to be unreasonable and a violation of the defendant's rights under the Fourth Amendment. Id. at 202, 211. In reaching this conclusion, the Court explained that four factors are pertinent when considering whether a delayed search was unreasonable: "(1) the length of the delay; (2) the importance of the seized property to the defendant; (3) whether the defendant had a reduced property interest in the seized item, and (4) the strength of the state's justification for the delay." Id. at 206 (citation omitted). The Court found the month-long delay between the seizure of the device and the warrant application to "well exceed[] what is ordinarily reasonable, that the defendant had a strong property interest in his device, and that law enforcement did "very little investigation" between the seizure of the device and the application for the warrant. Id. at 207-10. In balancing the relevant factors, the Court found that they weighed in favor of finding unreasonable delay and a Fourth Amendment violation. Id. at 211.

Although it held that the delay was unreasonable, the Court found that law enforcement had not "acted with deliberate intent to violate [the defendant's] rights or that it was reckless or grossly negligent … to allow a month to slip by before applying for a search warrant." Id. at 212. As a result, the Court explained that application of the exclusionary rule was not warranted and suppression was inappropriate. Id. at 212-13.

B.     The Delay in Searching The Additional Devices Was Reasonable

The present case is not <u>Smith</u>.  The government does not dispute that approximately two months passed between when the defendant's devices were detained by HSI under its border authority and when a warrant was obtained.  However, an examination of the relevant factors shows that, in totality, they weigh in the government's favor.

As the <u>Smith</u> Court instructed, "independent weight" must be given to the length of the delay and a "month-long delay well exceeds what is ordinarily reasonable."  <u>Id.</u> at 207.  As explained above, there is no dispute that authorization to search the defendant's laptop, USB drive, and memory card was obtained two months after they were seized.  This factor weighs in favor of the defendant.

The Court must also consider the importance of the seized property to the defendant.  <u>Id.</u> at 207.  Certainly, a person's electronic devices, which may store a wealth of personal and sensitive information, are presumptively important to them.  <u>Id.</u>; <u>see also</u> <u>United States v. Daskal</u>, 676 F. Supp. 2d 153, 168 (E.D.N.Y. 2023) (discussing the importance of electronic devices).  However, the Court must also consider the "particular significance of "a device to the defendant, whether the defendant had alternate devices, and whether a request was made for a device's return."  <u>Smith</u>, 967 F.3d at 208.

 The defendant's declaration submitted in support of his motion does not claim that these additional devices had any significance to him.  <u>See</u> Def. Mot, Ex. A.  The government is unaware of any request by the defendant for the return of the devices, and the defendant's declaration does not claim that he sought their return.  Moreover, the defendant appears to have had alternate devices at his disposal.  Upon the execution of a warrant at his residence in May 2023, following his indictment, law enforcement recovered hard drives, an iPhone, USB drives, and a computer from the defendant's residence, showing that he had these other devices for his

use.  These circumstances show that this second factor—the importance of the property to the defendant—weighs in the government's favor.  See Smith, 967 F.3d at 208 (finding the spare detail about a device's importance, the fact that alternative devices were available, and the fact that the defendant did not request the device back to weigh in favor of the government); see also United States v. Green, No. 18-CR-121 (RJA)(MJR), 2021 WL 1877236, at *5-6 (W.D.N.Y. Feb. 3, 2021) (explaining that the lack of evidence that a device was important to a defendant or that it was needed working in conjunction with the defendant's incarceration weighed in favor of the government).

Next, the Court must examine "whether the defendant had a reduced property interest in the seized item."  Smith, 967 F.3d at 208.  The Smith Court instructed that, even in cases where probable cause to seize an electronic device exists and reduces a person's property interest in it, law enforcement's interest is "delimited by the obligation to seek a search warrant without unreasonable delay."  Id. at 209.  The analysis also requires an inquiry into whether a defendant did something "to reduce his property interest by means of consent or voluntarily relinquishing control" of a device.  Id. at 208.  The level of law enforcement suspicion regarding a device also affects the analysis.  See United States v. Chang, No. 18-CR-681 (NGG), 2024 WL 1308775, at *8 (E.D.N.Y. Mar 27, 2024) ("[T]here are several elements that encompass the strength of this property interest [including] … the police's level of suspicion, meaning probable cause or reasonable suspicion."  (quoting United States v. Tisdol, 544 F. Supp. 3d 219, 226-27 (D. Conn. 2021)).

Here, the defendant had a reduced property interest in his electronic devices and this factor weighs in the government's favor.  As discussed above, CBP and HSI had reasonable suspicion to detain and search the defendant's devices because he was identified in a TECS

record as potentially possessing child pornography.  In today's world, child pornography almost exclusively is found in digital format and so it was reasonable for CBP and HSI to be concerned with any electronic media storage devices in the defendant's possession.  Further, although an initial examination of the defendant's laptop did not result in the discovery of child pornography, CBP officers did observe child pornography on the defendant's phone.  This discovery only served to heighten law enforcement's suspicion that other electronic devices may have contained additional child pornography.  Therefore, the government submits that CBP and HSI were justified in safekeeping the defendant's other devices to allow for further investigation.  The items became part of a criminal investigation, and law enforcement was permitted to detain and safekeep them to develop probable cause to search them.  See Tisdol, 544 F. Supp. at 227 (explaining how confiscation as part of an ongoing investigation may further reduce a person's interest in an electronic device).

The final factor to consider is the government's justification for the delay in seeking a warrant to search a device.  Smith, 967 F.3d at 210.  In Smith, the Court noted that the New York State police did not appear to have "engaged in any investigation" for nearly the entirety of the delay between seizure and the seeking of a warrant.  Id.  However, when the government has a reasonable justification for the delay in seeking a warrant, including ongoing investigation, this serves to tip this factor in the government's favor.  See, e.g., United States v. Corbett, No. 20-CR-213 (KAM), 2021 WL 4480626, at *6 (E.D.N.Y. Sept. 30, 2021) (finding that the fourth Smith factor weighed in the government's favor, in part, because the government continued to investigate and the warrant affidavit cited new evidence obtained after a device's seizure); Chang, 2024 WL 1308775, at *9 (finding that the government's continued investigation

and the agent's needs to learn the facts of the case contributed to justifying the delay in seeking a warrant).

In this case, the delay in obtaining a warrant for the defendant's additional devices was justified. This is not a case where law enforcement did not engage in any investigation between seizure of the devices and the obtaining of a search warrant. On the contrary, the assigned HSI agent applied for a warrant for the defendant's cell phone only days after it was detained. The warrant was then executed, data extracted from the phone, and an examination of that data began. The examination required the review of at least 241,872 files. In conducting that review, the assigned agent identified over 230 images containing CSAM and over 450 videos. There were over 2,360 individual images which were age difficult and an additional over 570 videos which were age difficult or contained bestiality. Simply put, this process took time. Further still, the investigation continued and required an examination of chats and other communication files because the evidence viewed suggested the defendant was in direct communication with children to obtain pornographic images. That investigation of the defendant's phone was still ongoing in January 2023, when the agent applied for a search warrant for the remaining devices.

The agent relied on the probable cause obtained from the judicially authorized search of the defendant's phone to apply for the warrant to search the additional devices. The affidavit in support of the second warrant contains details about the search of the defendant's phone, including the number of CSAM files found on the device, a description of them, and his assessment that more CSAM files would be found in other devices. Def. Mot., Ex. D, ¶¶ 11-13. The information from the first search directly supported the second warrant application. This

was especially important under the circumstances because CSAM was not found during the border search of the defendant's laptop.

The government disagrees with defendant's claim that probable cause for the additional devices already existed at the time of their seizure and that this continuing investigation was "not essential." See Def. Mot. at 20. As stated, a review of the defendant's laptop by CBP and HSI during the border search found no CSAM on the laptop. The government does not believe that a magistrate judge in this Court would have approved a warrant to search the laptop, USB drive and memory card in those circumstances. It was only after the examination of the defendant's cell phone yielded such a large amount of CSAM that law enforcement could be confident that additional CSAM would be found after a more thorough search of the other devices and could state in the warrant affidavit that they believed the presence of such a significant amount of CSAM on the defendant's phone provided probable cause that CSAM would be located and found on the defendant's other devices.

The defendant's position is a variation on the "heads I win, tails you lose" conundrum. He essentially urges this Court to adopt a rule that the government must proceed to seek a warrant even when probable cause for a search is thin. In such a case, anything the government finds in such a search is potentially subject to later suppression on the ground that the affidavit did not contain sufficient probable cause. But if the government waits to further develop probable cause, any delay may also potentially lead to suppression of the warrant. But the defendant's position is not correct. The government need not face this dilemma because, consistent with the Fourth Amendment, it is permitted to continue its investigation and obtain robust probable cause before seeking a search warrant. See Chang, 2024 WL 1308775, at *9; Corbett, 2021 WL 4480626, at *6.

C.     The Exclusionary Rule Does Not Require Suppression

Even if the court were to find that delay in seeking a warrant was unreasonable, the court should not suppress the evidence found on the laptop, USB drive and memory card. Indeed, in the primary case on which the defendant relies, the Smith court—while finding that law enforcement's delay in seeking a search warrant was unreasonable—nevertheless declined to suppress the evidence. Rather, the Smith court held that the exclusionary rule did not require suppression. Smith, 967 F.3d at 212-13. As the Court explained, "the exclusionary rule applies only if the police have violated the Constitution deliberately, recklessly, or with gross negligence, or if a constitutional violation is the product of recurring or systemic negligence." Id. at 211 (quoting Davis v. United States, 564 U.S. 229, 236-40 (2011)). The rule does not apply to "isolated simple negligence, because the exclusion in such circumstances will not result in appreciable deterrence of police misconduct." Id. at 211-12 (quoting Davis, 564 U.S. at 237-38)). Given the record there, where there was no evidence of deliberate intent to violate the Fourth Amendment, suppression was not warranted. Id. at 212.

The same rationale applies here. Even if the Court were to find that Agent Stepien's delay in seeking the January 2023 Warrant was unreasonable, there is no evidence that he acted to intentionally violate the defendant's rights. On the contrary, the pertinent facts demonstrate that the opposite is true. Agent Stepien acted promptly in obtaining a warrant for the defendant's cell phone only a few days after its detention at the airport. This conduct evinces diligence, not negligence and an effort to preserve the defendant's rights, not violate them. Given the ongoing investigation, the fact that the border search did not detect CSAM on the defendant's laptop, and the fact that a second warrant was obtained based on information discovered as a result of the first warrant, it cannot be said that a reasonably well-trained agent would have known the later search was illegal. Id. (citing Herring v. United States, 555 U.S.

135, 145 (2009)). Therefore, the exclusionary rule does not require suppression. See Chang, 2024 WL 1308775, at *11 (declining to apply the exclusionary rule when no evidence that law enforcement deliberately violated the Fourth Amendment); Green, 2021 WL 1877236, at *8-9 (finding that the exclusionary rule should not apply where there was no evidence of "deliberate, reckless, or grossly negligent" conduct or "systematic or reoccurring negligence"); Corbett, 2021 WL 4480626, at *7 (same).

CONCLUSION

For the reasons stated above, the defendant's motion should be denied in its entirety.

Dated:    Brooklyn, New York
        August 9, 2024

Respectfully submitted,

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:   /s/ Gilbert M. Rein
     Gilbert M. Rein
     Assistant United States Attorney
     (718) 254-6407